**In re IDEARC INC. et al., Debtors.**

**No. 09–31828 (BJH).**

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

Dec. 22, 2009.

Toby L. Gerber, Kristian W. Gluck, Ryan E. Manns, Fulbright & Jaworski L.L.P., Dallas, TX, Berry D. Spears, Anna Marie Mendez, Fulbright & Jaworski L.L.P., Austin, TX, for Debtors and Debtors-in-Possession.

*FINDINGS OF FACT AND CONCLU- SIONS OF LAW IN SUPPORT OF FIRST AMENDED JOINT PLAN OF REORGANIZATION OF IDEARC INC., ET AL., DEBTORS (AS MODIFIED)*

BARBARA J. HOUSER, Bankruptcy Judge.

On December 9 and 10, 2009, the Bankruptcy Court held hearings (collectively, the *"Confirmation Hearing"*)[1] to consider confirmation of the *First Amended Joint Plan of Reorganization of Idearc Inc., et al., Debtors (As Modified)* [Docket No. 1392] (the *"November 19 Plan,"* as amended by the Modifications,[2] the *"Plan"*), proposed by Idearc Inc. (*"Idearc"*) and its affiliated debtors and debtors-in-possession (together with Idearc, the *"Debtors"*).[3] The Bankruptcy Court makes the following findings of fact and conclusions of law (the *"Findings and Conclusions"*) in support of the Order confirming the Plan (the *"Confirmation Order"*):

■ 1. The following record (the *"Record"*) was established to support confirmation of the Plan:

(a) All documents identified on the Debtors' Second Amended Witness and Exhibit List filed on December 9, 2009 [Docket No. 1560] (the *"Exhibit List"*),[4] including, without limitation, the September 10 Plan, the Disclosure Statement and all exhibits, schedules and attachments thereto and filed in connection therewith, and the Plan Supplement filed with the Bankruptcy Court on October 29, 2009 [Docket No. 1225] (as certain of those documents have been amended in the form attached as exhibits to the Standby Purchase Agreement [Docket No. 1391]), all of which were admitted into evidence without objection;

---

1. Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to such terms in the Plan or the Disclosure Statement (defined below), as applicable.

2. The *"Modifications"* means the modifications to the November 19 Plan as set forth in (i) the First Amended Joint Plan of Reorganization of Idearc Inc., *et al.*, Debtors (As Modified on November 25, 2009) [Docket No. 1495] (the *"November 25 Plan"*), (ii) the modifications read into the record at the Confirmation Hearing and (iii) such other further modifications made in connection with entry of these Findings and Conclusions and the Confirmation Order or reflected in the final Plan attached as Exhibit 1 to the Confirmation Order.

3. In addition to Idearc Inc., the following entities are debtors in these related cases: Idearc Information Services LLC, Idearc Media LLC, Idearc Media Services—East Inc., Idearc Media Services—West Inc., Idearc Media Sales—West Inc., Idearc Media Sales—East LLC, Idearc Media Sales—East Co., License Application Corporation, and Second License Application Corporation.

4. All references herein to exhibits on the Exhibit List shall be to "Debtors' Ex. ___".

(b) The testimony at the Confirmation Hearing of (i) Scott Klein, Chief Executive Officer of the Debtors, (ii) Samuel D. Jones, Chief Financial Officer of the Debtors (Debtors' Ex. 175), (iii) Andrew Haber of Moelis & Company (Debtors' Ex. 174), (iv) Daniel Kamensky of Paulson & Co., Inc. (Debtors' Ex. 140), (v) John Bittner of Grant Thornton LLP (Debtors' Ex. 141) and (vi) Robert Q. Klamser of Kurtzman Carson Consultants LLC (Debtors' Ex. 173);

(c) The evidence in respect of the transmittal and service of the solicitation packages, all of which was filed with the Bankruptcy Court [Docket Nos. 1017, 1044] and admitted into evidence without objection;

(d) The evidence regarding tabulation of votes and supplemental Class 3 votes on the Plan which was filed with the Bankruptcy Court [Docket Nos. 1445, 1557] (the *"Ballot Reports"*) and admitted into evidence without objection;

(e) The entire record of the Debtors' chapter 11 cases (the *"Chapter 11 Cases"*) and the docket maintained by the Clerk of the Bankruptcy Court and/or Kurtzman Carson Consultants, LLC (*"KCC"*), its duly appointed agent, including, without limitation, all pleadings and other documents filed, all orders entered, and evidence and argument made, proffered, or adduced at the hearings held before the Bankruptcy Court during the pendency of these Chapter 11 Cases, as to all of which the Bankruptcy Court took judicial notice at the Confirmation Hearing;[5]

(f) The entire record of the adversary proceeding styled *The Official Committee of Unsecured Creditors, on behalf of Idearc Inc. v. JPMorgan Chase Bank, N.A., as Administrative Agent for the Lenders*, Adv. Proc. No. 09–03248 (the *"Adversary Proceeding"*) and the docket maintained by the Clerk of the Bankruptcy Court and/or its duly appointed agent, including, without limitation, all pleadings and other documents filed, all orders entered, and evidence and argument made, proffered, or adduced at the hearings and trial held before the Bankruptcy Court in connection with the Adversary Proceeding, as to all of which the Court took judicial notice at the Confirmation Hearing;

(g) The statements and argument of counsel on the record at the Confirmation Hearing, and all papers and pleadings filed with the Bankruptcy Court in support of, in opposition to, or otherwise submitted in connection with, confirmation of the Plan.

2. The evidence that was admitted into the Record in support of confirmation of the Plan and all related matters demonstrates, by a clear preponderance of the evidence, that the Plan is confirmable and should be confirmed.

3. The Plan satisfies all applicable requirements under title 11 of the United States Code (the *"Bankruptcy Code"*) and the Federal Rules of Bankruptcy Procedure (the *"Bankruptcy* Rules") and the Plan is in the best interests of the Debtors and their bankruptcy estates (the *"Estates"*), and supported by the Record, and therefore should be confirmed.

**5.** This Court takes judicial notice of the docket in these Chapter 11 Cases maintained by the clerk of the Bankruptcy Court and/or its duly appointed agent, including, without limitation, all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at the hearings held before the Bankruptcy Court during these Chapter 11 Cases, including, without limitation, the hearing to consider the adequacy of the Disclosure Statement and the Confirmation Hearing.

4. As presented at the Confirmation Hearing and as provided for herein, the consensual resolution of certain Objections and the Modifications satisfy all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules and are in the best interests of the Debtors and their Estates and supported by the Record, and therefore should be approved. All objections to confirmation of the Plan, which were not withdrawn or resolved by agreement at or prior to the Confirmation Hearing should be overruled, or are otherwise disposed of, as set forth herein and in the Confirmation Order.

5. The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. All findings of fact and conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing and at the hearing conducted on December 21, 2009, at which the Bankruptcy Court announced its ruling on confirmation of the Plan, are hereby incorporated herein for all purposes to the extent not inconsistent herewith. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

6. The Record amply supports confirmation of the Plan and the Bankruptcy Court will issue the Conformation Order confirming the Plan.

**A. Jurisdiction and Venue**

7. The Bankruptcy Court has subject matter jurisdiction to confirm the Plan pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper before the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409. Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (L), (N) and (O).

**B. Background**

8. On March 31, 2009 (the *"Petition Date"*), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Chapter 11 Cases are being jointly administered under the above-styled case for procedural and administrative purposes only pursuant to Bankruptcy Rule 1015(b).

9. Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**C. The Disclosure Statement and Plan**

10. On September 8, 2009, the Debtors filed their *Disclosure Statement With Respect to First Amended Joint Plan of Reorganization of Idearc Inc., et al., Debtors [As of September 8, 2009]* [Docket No. 915].

11. On September 10, 2009, the Bankruptcy Court issued its *Order (I) Approving The Disclosure Statement With Respect To First Amended Joint Plan Of Reorganization Of Idearc Inc., Et Al., Debtors (II) Approving Form Of Ballots And Proposed Solicitation And Tabulation Procedures For The First Amended Joint Plan Of Reorganization Of Idearc Inc., Et Al., Debtors; (III) Prescribing The Form And Manner Of Notice Thereof; (IV) Establishing Procedures For (A) Voting In Connection With The Plan Confirmation Process And (B) Temporary Allowance Of Claims Related Thereto; (V) Establishing Deadline For Filing Objections To The First Amended Joint Plan Of Reorganization Of Idearc Inc., Et Al., Debtors; And (VI) Scheduling A Hearing To Consider Confirmation Of The First*

*Amended Joint Plan Of Reorganization Of Idearc Inc., Et Al., Debtors* [Docket No. 940] (the *"Disclosure Statement Order"*) approving the *Disclosure Statement With Respect to First Amended Joint Plan of Reorganization of Idearc Inc., et al., Debtors* [Docket No. 941] (the *"Disclosure Statement"*) in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018, and establishing certain deadlines relating to confirmation of the Plan.

12. On or before September 21, 2009, the Debtors mailed the Disclosure Statement and related solicitation materials to solicit votes for the *First Amended Joint Plan of Reorganization of Idearc Inc., et al., Debtors* [Docket No. 942] (the *"September 10 Plan"*).

13. On November 18, 2009, the Bankruptcy Court approved the Debtors' entry into a Standby Purchase Agreement with Paulson & Co., Inc. (*"Paulson"*), pursuant to which Paulson agreed to provide a cash option to holders of Allowed Claims receiving shares of New Common Stock under the September 10 Plan [Docket No. 1386], and authorized the Debtors to make non-material modifications to the September 10 Plan to implement the Paulson cash option. Shortly thereafter, on November 19, 2009, the Debtors filed the November 19 Plan, which incorporated certain non-material modifications to implement the Paulson cash option for creditors.

14. On August 4, 2009, the Official Committee of Unsecured Creditors (the *"Committee"*) commenced the Adversary Proceeding against the Administrative Agent, seeking the following relief: (a) to avoid and preserve for the benefit of the Estates any liens on the Debtors' nearly 1200 copyrights and any receivables generated by the copyrights, (b) a declaration that the Administrative Agent does not have a lien on the Branding Agreement

between the Debtors and Verizon Communications Inc. and that the Branding Agreement is preserved for the benefit of the Estates, or, alternatively, that the Administrative Agent's purported lien on the Branding Agreement is invalid and avoided, (c) a determination of the scope of the Administrative Agent's collateral, and (d) a valuation of the Administrative Agent's collateral as of the Petition Date.

15. Following the commencement of the Adversary Proceeding, the parties engaged in an expedited discovery process involving the exchange of documents, answers to written interrogatories and requests for admission, more than 20 fact depositions, the exchange of expert reports, and the depositions of the five expert witnesses proposed by the parties. On November 2, 2009, each of the Committee, the Administrative Agent and the Debtors filed under seal pretrial briefs setting forth their arguments in the Adversary Proceeding.

16. Prior to the commencement of trial, the Committee stipulated to the dismissal with prejudice of Count 3 of its complaint seeking avoidance of the Administrative Agent's lien on the Verizon branding agreement. On November 9 and 10, 2009, the Bankruptcy Court conducted two days of trial on the Adversary Proceeding.

17. On November 19, 2009, the Debtors, along with the Committee, the Administrative Agent and MatlinPatterson Global Opportunities Partners III LP and Matlin-Patterson Global Opportunities Parties (Cayman) III LLP (collectively, the *"MatlinPatterson Entities"*) filed the *Joint Motion of Official Committee of Unsecured Creditors, Debtors, JPMorgan Chase Bank, N.A., as Agent, and Certain MatlinPatterson Entities, Pursuant to Sections 105(a), 1128 and 1129 of the Bankruptcy Code and Fed. R. Bankr.P. 9019(a), for an Order Approving Global*

*Settlement in Support of Plan of Reorganization* [Docket No. 1393] (the *"Global Settlement Motion"*). (Debtors' Ex. 132). The Global Settlement Motion described a global settlement agreed to among such parties (the *"Global Settlement Agreement"*) setting forth the terms of proposed modifications of the November 19 Plan that would enable the Debtors to exit chapter 11 on a consensual basis with its major constituencies.

18. The terms of the Global Settlement Agreement were incorporated into the November 25 Plan.

19. The Plan, incorporating the Global Settlement Agreement, is the result of extensive arms' length negotiations among the Debtors, the Committee, the Administrative Agent and the MatlinPatterson Entities and is supported by each of these parties. No evidence was submitted by any objecting party sufficient to rebut the Debtors' evidence concerning the good faith, arms' length nature of negotiations regarding the Global Settlement Agreement and the Plan.

**D. Notice**

■ 20. As set forth in the Record, the Debtors complied with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules and all other applicable laws in connection with the solicitation of votes on the Plan and the provision of notice of the dates of the Confirmation Hearing and the Friday, November 13, 2009 (by 6:00 p.m. (Central Time)), deadline for filing and serving objections to confirmation and for voting on the Plan and all other relevant deadlines related to the Plan.

21. On November 19, 2009, the Debtors filed a *Motion, Pursuant to 11 U.S.C. §§ 105, 1125, 1126 and 1127 and Fed. R. Bankr.P.2002, 3003, 3018 and 3019 to Approve Supplemental Solicitation Proce-* *dures for Class 3 Secured Credit Facility Claims* [Docket No. 1394] (the *"Supplemental Solicitation Motion"*). On November 25, 2009, the Bankruptcy Court entered an *Order Granting Debtors' Motion, Pursuant to 11 U.S.C. §§ 105, 1125, 1126 and 1127 and Fed. R. Bankr.P.2002, 3003, 3018 and 3019 to Approve Supplemental Solicitation Procedures for Class 3 Secured Credit Facility Claims* [Docket No. 1462] (the *"Supplemental Solicitation Order"*).

22. As set forth in the Record, the Debtors complied with the procedures described in the Supplemental Solicitation Motion, the Supplemental Solicitation Order, the Bankruptcy Code, the Bankruptcy Rules and all other applicable laws in connection with the supplemental solicitation of votes of holders of Class 3 Secured Credit Facility Claims on the November 25 Plan and the Tuesday, December 8, 2009 (by 6:00 p.m. (Central Time)), deadline for supplemental voting on the November 25 Plan.

23. As such, the notice [Docket Nos. 1017, 1044] provided with respect to all matters relating to the solicitation of votes on, and the confirmation of, the Plan was adequate and proper and satisfied the requirements of due process with respect to all creditors, equity holders and parties-in-interest who were provided actual or constructive notice.

**E. Modifications**

■ 24. The Modifications to the Plan are not material and therefore comply with section 1127 of the Bankruptcy Code. As provided by section 1127(a) of the Bankruptcy Code, the Debtors are authorized to propose the Modifications, and the Plan and Modifications satisfy the requirements of sections 1122, 1123, and 1125 of the Bankruptcy Code. The Modifications will

not adversely change the treatment of any Claims or Idearc Interests of any parties-in-interest who have not accepted the Modifications. Pursuant to section 1127(d) of the Bankruptcy Code and Bankruptcy Rule 3019, unless (in respect of the material modifications to the treatment of Class 3 Claims made to the November 19 Plan) superseded by timely delivery of a supplemental Class 3 ballot in the case of holders of Class 3 Secured Credit Facility Claim, as provided in the Supplemental Solicitation Order, all acceptances of the Plan prior to such Modifications are deemed acceptances of the Plan, as modified.

## F. Voting

25. As set forth in the Record, each impaired Class of Claims and Idearc Interests, on a Debtor–by–Debtor basis, either (a) voted to accept the Plan under section 1126 of the Bankruptcy Code and for purposes of section 1129(a)(8)(A) of the Bankruptcy Code, (b) is not impaired under section 1124 of the Bankruptcy Code and for the purposes of section 1129(a)(8)(B) of the Bankruptcy Code, or (c) is impaired pursuant to section 1124 of the Bankruptcy Code and voted to reject the Plan under section 1126 of the Bankruptcy Code, but is receiving treatment that satisfies the applicable requirements of section 1129(b) of the Bankruptcy Code. Voting on the Plan and treatment thereunder, including the supplemental Class 3 voting, are as reflected in the Ballot Reports.

## G. Settlement of Certain Inter–Debtor Issues

26. As described in Section IV.U.4 of the Disclosure Statement, and in the corroborating testimony of Samuel D. Jones at the Confirmation Hearing, the Debtors have historically operated their business as a single integrated enterprise, which gave rise to numerous intercompany relationships and transactions. For example, the Debtors utilize a centralized cash management system and certain essential functions, such as providing capital, personnel, human resources and administrative functions, and performing commercial activities, are performed or provided by particular Debtors for the benefit of other members of the enterprise, rather than on an entity-by-entity basis. These activities, in turn, gave rise to intercompany Claims both in terms of amount and number in these Chapter 11 Cases, the proper treatment of which could have been subject to substantial dispute and the resolution of which was uncertain.

27. Based upon the Record, the settlement of all intercompany Claims and related matters as set forth in Section 5.5 of the Plan, including without limitation, the releases set forth in the Plan, are fair and equitable and in the best interests of the Debtors, their Estates and all other parties-in-interest, including all creditors, and satisfies the applicable requirements of the Bankruptcy Code and the Bankruptcy Rules. Accordingly, such settlement should be approved.

## H. Approval of Global Settlement Agreement

28. Prior to the Confirmation Hearing, the Debtors, the Committee, the Administrative Agent and the MatlinPatterson Entities filed the Global Settlement Motion, [Docket No. 1393] seeking approval of the Global Settlement Agreement.[6] (Debtors' Ex. 132). The Global Settlement Agreement was incorporated into the Plan pursuant to a Modification, and is incorpo-

---

6. A true and correct copy of the Global Settlement Motion is attached hereto as *Exhibit 1,* and, by this reference, incorporated herein for all purposes.

rated in the Confirmation Order for all purposes.

29. As evidenced by the certificate of service [Docket No. 1492] previously filed with this Bankruptcy Court, the Bankruptcy Court finds that notice of the Global Settlement Motion and Global Settlement Agreement was provided to all parties entitled to notice, is adequate, appropriate, reasonable and proper for all purposes and is hereby approved. Moreover, the disclosures made by the Debtors concerning the Global Settlement Agreement were complete and adequate and appropriate under the circumstances.

30. The negotiations surrounding the Global Settlement Agreement were conducted in good faith and at arms' length, and the Global Settlement Agreement is of benefit to the Debtors' Estates and represents, a fair and reasonable compromise of the issues in dispute in the Adversary Proceeding and related litigation, and resolves potential objections to confirmation of the Plan. The terms and conditions of the Global Settlement Agreement are embodied in the terms of the Plan, and are an integral part of the Plan. The Global Settlement Agreement represents a compromise of all issues related to the Adversary Proceeding and certain related issues, as set forth in the Global Settlement Agreement. All issues related to the Adversary Proceeding shall be deemed fully settled and compromised, and all proceedings related to the Adversary Proceedings, and related proceedings as set forth in the Global Settlement Agreement, shall be deemed dismissed with prejudice, in each case as of the Effective Date.

31. The Bankruptcy Court has considered the following with respect to the Global Settlement Agreement: (a) the probability of success in the Adversary Proceeding, with due consideration for the uncertainty in fact and law, (b) the complexity and likely duration of the litigation involved and any attendant expense, inconvenience and delay regarding confirmation of the Plan, (c) that the Global Settlement Agreement resolves the objections to confirmation of the Committee and the MatlinPatterson Entities, the Debtors' largest bondholders, (d) significantly increases the consideration to be paid to Class 4 unsecured creditors, (e) provides further enhanced distributions to holders of Class 4 non-bank/non-bond unsecured claims, and (f) all other factors bearing on the reasonableness of the compromise embodied in the Global Settlement Agreement.

32. As part of the overall compromise and settlement set forth in the Global Settlement Agreement, the Administrative Agent and the Lenders agreed to make (a) $120 million of Cash and 15% of the New Common Stock available for distribution to holders of Unsecured Note Claims and (b) $3 million of Cash available for distribution to holders of General Unsecured Claims, and the Debtors, the Administrative Agent, the Committee and the MatlinPatterson Entities agreed to share distributions from the Litigation Trust as set forth in Section 3.3(b)(1) of the Plan. These arrangements are an essential component of the compromise, and absent these arrangements, it is uncertain whether the parties would have been able to finalize the Global Settlement Agreement. In such case, the Debtors emergence from Chapter 11 would have been delayed, administrative expenses would have increased and the ultimate result would be uncertain, all to the detriment of the Debtors' Estates and their respective creditors and other parties-in-interest.

33. After giving due consideration to the above factors and the testimony of Rebwar Berzinji [Docket No. 1562], the Bankruptcy Court finds that the Global Settlement Agreement (a) is fair, equita-

ble, reasonable and is within the range of potential outcomes of the litigation, (b) is in the best interest of the Debtors, their Estates and all other parties-in-interest in these Chapter 11 Cases, including all creditors and interest holders, and (c) except with respect to the supplemental solicitation procedures authorized by the Supplemental Solicitation Order with respect to Class 3 Secured Credit Facility Claims, does not require further solicitation or re-solicitation of creditors entitled to vote on the Plan. Therefore, the Global Settlement Motion and Global Settlement Agreement satisfy the applicable standards of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and should be approved in their entirety.

## I. Approval of the Ryan Settlement Agreement

34. Prior to the Confirmation Hearing, the Debtors, the Committee and the Administrative Agent filed the *Joint Motion Of The Debtors And The Official Committee Of Unsecured Creditors Pursuant To Sections 105(a), 1123 And 1129 Of The Bankruptcy Code And Fed. R. Bankr.P. 9019(A), For An Order Approving Stipulation And Settlement Agreement Regarding (I) Amount And Allowance Of Sean Ryan's Claim, (II) Withdrawal Of Motions, Objections And Other Pleadings Filed By Sean Ryan, And (III) Dismissal Of Adversary Proceeding Initiated By Sean Ryan* [Docket No. 1489] (the *"Sean Ryan Settlement Motion"*).[7] The Sean Ryan Settlement Motion described a settlement agreed to among such parties (the *"Sean Ryan Settlement Agreement"*) setting forth the terms of a consensual resolution of various issues relating to the Plan, the Prepetition Actions, the Ryan Adver-

sary Proceeding, the Ryan Pleadings and the Ryan Claims.

35. As evidenced by the certificate of service attached to the Sean Ryan Settlement Motion [Docket No. 1489], the Bankruptcy Court finds that notice of the Sean Ryan Settlement Motion and Sean Ryan Settlement Agreement was provided to all parties entitled to notice, is adequate, appropriate, reasonable and proper for all purposes and is hereby approved. Moreover, the disclosures made concerning the Sean Ryan Settlement Agreement were complete and adequate and appropriate under the circumstances.

36. The Bankruptcy Court adopts the findings of fact and conclusions of law announced at the Confirmation Hearing with respect to the Ryan Settlement Agreement.

## J. Modification of Treatment of Employee Claims for Accrued Vacation

37. On the Petition Date, the Debtors filed their Emergency Motion For Order Under 11 U.S.C. §§ 105(a), 363(b), 363(c), 507(a), 1107(a) And 1108 And Federal Rule Of Bankruptcy Procedure 6003 To Approve Payment Of Prepetition Wages, Salaries, Commissions, Reimbursable Employee Expenses And Benefits In The Ordinary Course Of Business [Docket No. 10] (the *"Employment Benefits Motion"*). Pursuant to the Employment Benefits Motion, the Debtors sought authority to pay, continue, or otherwise honor various prepetition employee-related obligations to or for the benefit of their current employees (collectively, the *"Employees"*), for compensation, benefits and expense reimbursements under all plans, programs and policies maintained or contributed to, and agreements entered into, by the Debtors prior to the Petition Date (as described

---

7. A true and correct copy of the Sean Ryan Settlement Motion is attached hereto as *Ex-* *hibit 2*, and, by this reference, incorporated herein for all purposes.

below, the *"Employee Programs"*). Among the Employee Programs are the Debtors' plans, programs, policies and agreements providing for holiday and vacation pay.

38. On April 2, 2009, the Bankruptcy Court entered an interim order granting the Employee Benefits Motion [Docket No. 54]. On April 29, 2009, the Bankruptcy Court entered an order granting the Employee Benefits Motion. No party appealed the order and the order became final and non-appealable [Docket No. 195] (the *"Employee Benefits Order"*). Pursuant to the Employee Benefits Order, the "Debtors are authorized to continue each of the Employee Programs, including but not limited to maintaining the Employee Benefits in the ordinary course of business during the pendency of these cases in the manner and to the extent that such Employee Programs were in effect immediately prior to the filing of these cases and to make payments in connection with expenses in the administration of any Employee Program."

39. On April 15, 2009, the Debtors filed their Schedules of Assets and Liabilities [Docket Nos. 108–116, 121]. (Debtors' Ex. 99). On September 9, 2009, the Debtors filed their Amended Schedules of Assets and Liabilities [Docket Nos. 924–933] (and together with the Initial Schedules, the *"Schedules"*). (Debtors' Ex. 100). Pursuant to the Schedules, the Debtors listed Employee Claims for accrued holiday and vacation pay as of the Petition Date. In addition, certain Employees have filed Claims in the Debtors' Bankruptcy Cases.

40. Since the Petition Date, pursuant to the Employee Benefits Order, Employees have continued to take their vacation and holiday pay in the ordinary course of business and pursuant to the applicable benefit plans and related agreements. The Debtors have informed all Employees

holding or asserting Claims (whether an Administrative Claim, Other Priority Claim or General Unsecured Claim) for accrued vacation and holiday pay that they are entitled to their respective benefits in accordance with all policies and procedures in place prior to the commencement of these Bankruptcy Cases, but that such Employees will not receive monetary distributions on account of such vacation and holiday pay Claims.

41. The Debtors thus seek non-material modifications to the Plan, consistent with the Employee Benefits Order, to provide that all Claims for accrued vacation and holiday pay shall be unaffected by the Plan. All Employees holding or asserting vacation of holiday pay Claims (whether an Administrative Claim, Other Priority Claim or General Unsecured Claim) shall receive no monetary distributions on account of such Claims, and such Employees shall continue to be entitled to all vacation and holiday pay benefits in accordance with the terms and conditions of the applicable benefit plans and related agreements and the Employee Benefits Order.

42. The Modification set forth in Paragraphs [37] through [41] of these Findings and Conclusions are not material and therefore comply with section 1127 of the Bankruptcy Code. These Modification do not adversely change the treatment of any Employee's Claim (whether an Administrative Claim, Other Priority Claim or General Unsecured Claim) for accrued vacation and holiday pay because (a) Employees shall be entitled to take their vacation and holiday time off in the ordinary course in accordance with the terms and conditions of the applicable benefit plans and related agreements and (b) any payments, if at all, on account of accrued holiday or vacation days shall be made in accordance with the terms of the applicable policies in the ordinary course of the

Debtors' business in accordance with the terms of the Employee Benefits Order.

### K. Implementation of the Plan

■ 43. Section 5 of the Plan provides the means for implementing the Plan. The provisions of Section 5 of the Plan and the transactions and transfers to be implemented pursuant thereto (the *"Plan Transactions"*), are consistent with and permissible under section 1123(a)(5) of the Bankruptcy Code and are consistent with the interests of creditors, equity holders and public policy.

■ 44. Each of the Plan Transactions is necessary and appropriate in order to facilitate and ensure the feasibility of the Plan, preserve tax attributes, facilitate the reorganization and maximize value for the Debtors, their Estates, creditors and other parties-in-interest. Approval of the Plan Transactions is within the authority of the Bankruptcy Court pursuant to section 1123(a) of the Bankruptcy Code and otherwise in furtherance of the general principles of the Bankruptcy Code. The Plan Transactions represent the exercise of the sound business judgment of the Debtors, will benefit the Debtors' Estates and are proposed in good faith.

45. The entry of the Confirmation Order shall constitute authorization for the Debtors and their representatives to take or cause to be taken all actions necessary, reasonable or appropriate to implement all provisions of, and to consummate, the Plan prior to, on and after the Effective Date, including without limitation, the Plan Transactions. All such actions taken or caused to be taken consistent with the terms of the Confirmation Order and the Plan shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation.

### L. New Board of Reorganized Idearc

46. The New Board of Reorganized Idearc will consist of the following individuals: Edward Bayone, Robert C. Blattberg, Charles B. Carden, Robin Domeniconi, Thomas Gardner, David E. Hawthorne, Scott W. Klein and Thomas S. Rogers.

### M. New Securities Under the Plan

47. As a part of the consideration to be paid to certain holders of Allowed Claims, the following equity and rights will be issued under the Plan. Reorganized Idearc will issue New Common Stock on the Effective Date for distribution to (a) holders of Allowed Secured Credit Facility Claims, which number of shares shall represent eighty-five percent (85%) of the New Common Stock to be issued and outstanding on the Effective Date, and (b) holders of Allowed Unsecured Note Claims and certain Allowed General Unsecured Claims, which number of shares shall represent fifteen percent (15%) of the New Common Stock to be issued and outstanding on the Effective Date. The New Common Stock, plus any other securities issued under the Plan, are referred to as the *"New Securities"*.

48. The Plan authorizes and directs Reorganized Idearc to establish and implement a New Equity Incentive Plan as of the Effective Date, pursuant to which awards granted may be in the form of stock options, stock appreciation rights, restricted stock, and other forms of equity-based awards. The New Equity Incentive Plan will be promulgated by the New Board for the benefit of such members of management, employees and directors of the Reorganized Debtors as are designated by the New Board, or a committee designated by the New Board, on such terms as to timing, issuance, manner and timing of vesting, duration, individual entitlement, and all other terms, as such terms

are determined by the New Board in its sole and absolute discretion. The New Equity Incentive Plan may be modified or amended from time to time by the New Board, and all decisions as to entitlement to participate in any equity or equity-based plans will be within the sole and absolute discretion of the New Board or a committee designated by the New Board. Reorganized Idearc will reserve shares of the New Common Stock (excluding shares that may be issuable as a result of the anti-dilution provisions thereof) for distributions of equity incentive awards to be granted under the New Equity Incentive Plan, which number of shares will represent up to 10% of the New Common Stock to be issued and outstanding on the Effective Date.

49. The offer, sale, issuance and/or distribution of each of the New Securities is duly authorized. Moreover, the New Securities are being offered, sold, issued or distributed (a) by the Debtors, which are not underwriters as defined in section 1145(b) of the Bankruptcy Code, (b) under the Plan and (c) in exchange for Claims against one or more of the Debtors, or principally in exchange for such Claims and partly for cash or property, within the meaning of section 1145(a)(1) of the Bankruptcy Code and, therefore the offer, sale, issuance and/or distribution of the New Securities by the Debtors, are exempt from the requirements of section 5 of the Securities Act of 1933 and any state or local law requiring registration prior to the offering, issuance, distribution or sale of a security on account of the applicability of section 1145(a)(1) of the Bankruptcy Code.

50. Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any party pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) to the issuance, distribution, transfer, or exchange of the New Term Loans or the New Securities, or any other debt, equity security or other interest in the Debtors or the Reorganized Debtors; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment or recording of any lease or sublease; (d) the grant of collateral under or in connection with the New Term Loan Agreement and ancillary documents related thereto and the New Term Loans; or (e) the making, delivery, or recording of any deed or other instrument of transfers under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be taxed under any law imposing a stamp tax or similar tax.

## N. Claims for Payment of Taxes From Responsible Parties

51. Certain current and former officers or directors of the Debtors that are alleged to be "responsible parties" for payment of certain taxes allegedly not paid by the Debtors have received demand letters stating that they are obligated to pay certain taxes (Debtors' Ex. 149).

52. Section 3.1(b) of the Plan provides that each holder of an Allowed Priority Tax Claim or an Allowed Secured Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim or an Allowed Secured Tax Claim, as shall have been determined by the Debtors, (i) regular installments payable in Cash, over a period not exceeding five years after the Petition Date, having a total value, as of the Effective Date, equal

to the Allowed amount of such Claim; (ii) such different treatment as to which the applicable Debtor and such holder have agreed in writing.

### O. Notice of the Confirmation Hearing and Cure Amounts

53. Actual written notice of the Confirmation Hearing [Docket Nos. 1017, 1044], and a reasonable opportunity to object or be heard with respect thereto was provided to: (a) the Office of the United States Trustee; (b) the Debtors' equity holders; (c) all entities known to have, or to have asserted, any lien, claim, encumbrance or other property interest in or upon any of the Debtors' assets; (d) all taxing authorities for those jurisdictions in which the Debtors' assets are located; (e) the Internal Revenue Service; (f) all counterparties to the Debtors' unexpired leases and executory contracts; (g) all parties that filed a notice of appearance and request for service of papers in these Chapter 11 Cases; (h) all relevant state and federal environmental authorities; and (i) all known creditors of the Debtors. Such notice was adequate, reasonable and proper notice of the time and place of the Confirmation Hearing and the opportunity to object and be heard with respect thereto.

54. The Debtors also gave notice [Docket Nos. 1017 and 1044] (the *"Cure Notice"*) of the proposed cure amount (the *"Cure Amount"*) to each non-debtor counterparty to an executory contract or unexpired lease that the Debtors seek to assume under the Plan (collectively, the *"Assumed Contracts"*). The service of such Cure Notice was good, sufficient and appropriate under the circumstances and no further notice need be given to any party in respect of establishing a Cure Amount for the respective Assumed Contract. Non-debtor counterparties to the Assumed Contracts have had a sufficient,

reasonable and appropriate opportunity to object to the Cure Amount.

55. As further evidenced by the certificates of service previously filed with this Court, proper, timely, adequate, and sufficient notice of the Confirmation Hearing and the assumption of the Assumed Contracts has been provided in accordance with Bankruptcy Rules 2002, 6006 and 9014 [Docket Nos. 1017, 1044]. The Debtors also have complied with all obligations to provide notice of the Confirmation Hearing and the assumption of the Assumed Contracts as required by the Disclosure Statement Order. The foregoing notices described in paragraphs [53] through [54] were adequate, sufficient and proper under the circumstances, and no other or further notice of the Confirmation Hearing or the assumption of the Assumed Contracts is required.

56. The disclosures made by the Debtors concerning the Confirmation Hearing and the assumption of the Assumed Contracts were reasonable, complete and adequate under the circumstances and such notices comply with the provisions of the Bankruptcy Rules, the Federal Rules of Civil Procedure and the Local Bankruptcy Rules for the Northern District of Texas.

### P. Creation of the Litigation Trust

57. The Idearc Inc. *et al.* Litigation Trust (the *"Litigation Trust"*) is approved and all necessary parties, including the Litigation Trustee (defined below), are hereby authorized to execute the Litigation Trust Agreement in substantially the form attached as Exhibit 2 to the Confirmation Order (the *"Trust Agreement"*).

58. The creation of the Litigation Trust is reasonable and appropriate and will be used to prosecute the Litigation Trust Rights and conduct such other action as described in and authorized by the Plan, and to make timely and appropriate

distributions to holders of Allowed Claims and to hold and manage all Litigation Trust Rights, and otherwise carry out the provisions of the Trust Agreement. The transactions to be consummated in connection with the transfer of assets to the Litigation Trust as set forth in the Plan are in the best interests of the Debtors, their Estates and all other parties-in-interest, including all creditors, and otherwise satisfies the requirements of the Bankruptcy Code and Bankruptcy Rules, and should be approved.

59. The Litigation Trust will be administered by an initial trustee approved by the Bankruptcy Court (the *"Litigation Trustee"*). Pursuant to the terms of the Trust Agreement, U.S. Bank National Association is appointed as the initial Litigation Trustee.

## Q. Releases, Exculpations and Injunctions

60. The Plan provides for various releases, exculpations and injunctions pursuant to Sections 10. 6, 10.7, 10.8, 10.9 and 10.10 thereof.

61. The releases, exculpations and injunctions provided for by the Plan (a) are within the proper jurisdiction and purview of the Bankruptcy Court under 28 U.S.C. § 1334; (b) are integral elements of the transactions incorporated into the Plan; (c) confer material benefit on, and are in the best interests of, the Debtors, their Estates and their creditors; (d) are important to the overall objectives of the Plan and resolve the Claims that are the subject of the releases, exculpations and injunctions; (e) to the extent they impact claims against certain non-Debtors (such as the Debtors' officers and directors), such claims are channeled to insurance proceeds; and (f) are consistent with sections 105, 524, 1123, 1129, and 1141 and other applicable provisions of the Bankruptcy Code.

## R. Assumption of the Assumed Contracts

■ 62. The Debtors have exercised reasonable business judgment in determining whether to assume or reject each of the Debtors' executory contracts and unexpired leases under the terms of the Plan and the Confirmation Order. The assumption of the Assumed Contracts pursuant to the terms of the Confirmation Order and the Plan is in the best interest of the Debtors and their Estates, creditors and other parties-in-interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

63. Each pre– or post-confirmation assumption or rejection of an executory contract or unexpired lease pursuant to Section 6 of the Plan shall be legal, valid and binding upon the applicable Debtor, and all non-Debtor parties to such executory contract or unexpired lease, as applicable, all to the same extent as if such assumption or rejection had been effectuated pursuant to an appropriate order of the Bankruptcy Court entered before the Confirmation Date under section 365 of the Bankruptcy Code. Each of the executory contracts and unexpired leases to be assumed or rejected is deemed to be an executory contract or an unexpired lease, as applicable.

64. As set forth in Section 6 of the Plan and the Confirmation Order, the Plan constitutes a motion to assume the Assumed Contracts. Except as otherwise provided in a separate order of the Bankruptcy Court, any non-Debtor party to an Assumed Contract was required to object to such assumption or to the cure amounts proposed by the Debtors in connection therewith by no later than November 13, 2009, notice of which this Bankruptcy Court finds was reasonable and appropriate, having been

provided on or about September 21, 2009 [Docket Nos. 1017, 1044].

65. All executory contracts and unexpired leases not rejected pursuant to the Plan shall be deemed assumed as of the Effective Date. Each executory contract or unexpired lease to be rejected pursuant to the Plan is burdensome and the rejection thereof is in the best interests of the Estates.

66. The respective Cure Amounts are the sole amounts necessary under sections 365(b)(1)(A) and (B) of the Bankruptcy Code to cure all monetary defaults and pay all actual pecuniary losses under the Assumed Contracts.

67. The Debtors have (a) cured and/or provided adequate assurance of cure of any and all defaults existing prior to the Effective Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; and (b) provided compensation or adequate assurance of compensation to any party for actual pecuniary loss to such party resulting from a default prior to the Effective Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.

68. The Debtors have provided adequate assurance of their future performance under the relevant Assumed Contracts within the meaning of sections 365(b)(1)(C) and 365(b)(3) (to the extent applicable) of the Bankruptcy Code.

69. Upon the entry of the Confirmation Order, (a) all of the requirements of section 365(b) will have been satisfied with respect to each Assumed Contract for which no timely objection was filed; (b) all rights to object to the assumption of any such Assumed Contract will have been waived; (c) except as the Bankruptcy Court may hereafter determine is necessary and appropriate to effect the purpose of the Bankruptcy Code, all rights to object to the Cure Amounts with respect to any such Assumed Contracts will have been waived; and (d) the assumption of such Assumed Contracts are hereby approved.

## S. Bankruptcy Rule 3020(e)

70. Good cause exists for waiving and eliminating the stay of the Confirmation Order set forth in Bankruptcy Rule 3020(e). In particular, the Plan represents a fair and equitable compromise by and among the major parties-in-interest in the Chapter 11 Cases and should be consummated as expeditiously as possible. If the stay is not waived and eliminated, the ability of the Debtors to consummate the Plan by December 31, 2009, could be delayed.

## T. Plan Supplement

71. The Plan Supplement, as amended or supplemented as contemplated and permitted by the Plan, is reasonable, necessary and appropriate to effectuate the Plan.

## U. Certain Tax Consequences Under the Plan

72. The resolution of all intercompany Claims among the Debtors, as called for by the Plan, will occur, if at all, prior to, and independent from, the remainder of the means to implement the Plan and will be so treated under the Internal Revenue Code.

73. Under the Plan, as proposed and confirmed, the Debtors will be restructured pursuant to the means for implementation set forth in Section 5 of the Plan.

74. Pursuant to the Plan, Idearc will transfer to Reorganized Idearc more than fifty percent (50%) of the fair market value of the gross assets held by Idearc immediately prior to the transfer and more than seventy percent (70%) of the fair market

value of the operating assets held by Idearc immediately prior to the transfer and, therefore, upon such transfer Reorganized Idearc will acquire "substantially all of the assets" of Idearc within the meaning of section 354(b)(1)(A) of the Internal Revenue Code.

75. Giving effect to the cancellation of indebtedness occurring pursuant to the Plan, the fair market value of the property to be transferred by Idearc to Reorganized Idearc will exceed the sum of the amount of the liabilities of Idearc that are assumed by Reorganized Idearc in connection with the exchange and the amount of money and the fair market value of any other property received by Idearc in connection with the exchange.

76. The principal purpose of the Plan, as proposed and confirmed, and of each transactions set forth therein, is not the avoidance or evasion of Federal income tax within the meaning of section 269 of the Internal Revenue Code and the Treasury Regulations promulgated thereunder, and the Plan therefore complies with section 1129(d) of the Bankruptcy Code.

**V. The Plan Complies with Section 1129 of the Bankruptcy Code**

77. To obtain confirmation of the Plan, the Debtors must demonstrate that the Plan satisfies the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence. *See Heartland Fed. Sav. & Loan Assoc. v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1165 (5th Cir.1993), *cert, denied*, 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993); *In re MCorp Fin., Inc.*, 137 B.R. 219, 225 (Bankr.S.D.Tex. 1992); *In re Arnold*, 80 B.R. 806, 807 (Bankr.M.D.La.1987); *see also In re J T Thorpe Co.*, 308 B.R. 782, 785 (Bankr. S.D.Tex.2003), *aff'd*, 2004 WL 720263 (S.D.Tex. Mar.3, 2004); *In re Kent Termi-*

*nal Corp.*, 166 B.R. 555, 561 (Bankr. S.D.N.Y.1994); 7 *Collier On Bankruptcy* 1129.02[4], at 1129–22 (15th rev. ed.2005).

78. As demonstrated by the Record, the Plan complies with all relevant sections of the Bankruptcy Code, the Bankruptcy Rules and applicable non-bankruptcy law relating to the confirmation of the Plan. In particular, the Plan complies with all of the requirements of section 1129 of the Bankruptcy Code.

79. The Debtors have satisfied section 1121 of the Bankruptcy Code in that the Debtors have standing to file a plan. Furthermore, the Plan reflects the date it was filed with the Court and identifies the entities submitting it as Plan proponents, thereby satisfying Bankruptcy Rule 3016(a).

**W. The Plan Complies with Section 1129(a)(1) of the Bankruptcy Code**

80. Pursuant to section 1129(a)(1) of the Bankruptcy Code, a plan of reorganization must "compl[y] with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1). The legislative history of section 1129(a)(1) of the Bankruptcy Code indicates that a principal objective of this provision is to assure compliance with the sections of the Bankruptcy Code governing classification of claims and interests and the contents of a plan of reorganization. *See* S.Rep. No. 95-989, at 126 (1978); H.R.Rep. No. 95-595, at 412 (1977), U.S.Code Cong. & Admin.News 1978, at pp. 5787, 5912, 6368; *see also JT Thorpe*, 308 B.R. at 785; *In re Gen. Homes Corp.*, 134 B.R. 853, 861 (Bankr.S.D.Tex.1991). As demonstrated below and in the findings contained herein, the Plan complies fully with the requirements of sections 1122 and 1123 of the Bankruptcy Code, as well as the other applicable provisions of the Bankruptcy Code.

81. Under section 1122 of the Bankruptcy Code, a plan may provide for multiple classes of claims or interests so long as each claim or interest within a class is substantially similar to other claims or interests in that class. Significantly, a plan proponent is afforded significant flexibility in classifying claims under section 1122(a) of the Bankruptcy Code provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar. *See Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1278 (5th Cir.1991), *cert. denied*, 506 U.S. 821, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992); *Aetna Cas. & Sur. Co. v. Clerk (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir.1996); *In re Simmons*, 288 B.R. 737, 743 n.11 (Bankr.N.D.Tex.2003); *In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 860 (Bankr.S.D.Tex.2001); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 757 (Bankr.S.D.N.Y.1992); *In re Eagle Bus Mfg., Inc.*, 134 B.R. 584, 596 (Bankr.S.D.Tex.1991), *aff'd*, 158 B.R. 421 (S.D.Tex.1993).

82. Section 1122 of the Bankruptcy Code does not require that all substantially similar claims be placed in the same class. *In re Meadow Glen, Ltd.*, 87 B.R. 421, 424 (Bankr.W.D.Tex.1988). Decisions interpreting section 1122(a) generally uphold separate classification of different groups of unsecured claims when a reasonable basis exists for the classification. *See Greystone III*, 995 F.2d at 1278; *see also Sentry Operating*, 264 B.R. at 860; 7 *Collier on Bankruptcy* § 1122.03[4][a], at 1122–11 (15th ed. rev.2005). The Bankruptcy Code only prohibits the identical classification of dissimilar claims and does not require the same classification for claims sharing some attributes. *See Chateaugay*, 155 B.R. at 630; *In re 499 W.*

*Warren St. Assocs., Ltd. P'ship*, 151 B.R. 307, 312 (Bankr.N.D.N.Y.1992). Classification of substantially similar claims in different classes is permitted for purposes of reorganization only and for reasons independent of debtor's motivation to secure the vote of an impaired, assenting class of claims; similar claims may not be classified differently to gerrymander affirmative votes on the reorganization plan. *Greystone III*, 995 F.2d at 1278–79.

83. The Plan's classification scheme conforms to the statute, as the Plan separately classifies Claims based on valid business and legal reasons, particularly Classes 1, 2, 3, 4, 5, 6, and 7. The Plan's classification scheme is rationally based because it is based on the respective legal rights of each holder of a Claim against or Idearc Interest in the applicable Debtor's Estate and the proposed classifications were not proposed to create a consenting impaired class or to manipulate class voting.

84. Every chapter 11 plan must comply with the requirements set forth in section 1123(a) of the Bankruptcy Code. The Plan complies fully with each such requirement:

(i) Under section 1123(a)(1), a plan must "designate, subject to section 1122 of this title, classes of claims, other than claims of a kind specified in section 507(a)(1), 507(a)(2), or 507(a)(8) of this title, and classes of interest." Section 2 of the Plan designates classes of Claims and Idearc Interests that require classification.

(ii) Under section 1123(a)(2), a plan must "specify any class of claims or interests that is not impaired." Section 3.2 of the Plan specifies which classes of Claims and Idearc Interests are not impaired under the Plan.

(iii) Under section 1123(a)(3), a plan must "specify the treatment of any class of claims or interests that is impaired." Sections 3.3 and 3.4 of the Plan specify which classes of Claims and Idearc Interests are impaired, and their treatment, under the Plan.

(iv) Under section 1123(a)(4), a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." As reflected in the treatment set forth in Section 3 of the Plan, the treatment of each of the Claims and Idearc Interests in each particular class is the same as the treatment of each of the other Claims or Idearc Interests in such class or the holder of a particular claim or interest has agreed to a less favorable treatment of such particular claim or interest; *provided, however,* to the extent (a) holders of Allowed Unsecured Note Claims in Class 4, Sub–Class 1 or electing Allowed General Unsecured Claims in Class 4, Sub–Class 1 receive better treatment than holders of Allowed Unsecured Credit Facility Claims in Class 4, Sub–Class 1, or (b) holders of Allowed General Unsecured Claims in Class 4, Sub–Class 2 receive better treatment than holders of Allowed Unsecured Note Claims in Class 4, Sub–Class 1, electing Allowed General Unsecured Claims in Class 4, Sub–Class 1 or Allowed Unsecured Credit Facility Claims in Class 4, Sub–Class 1, the Bankruptcy Court finds that such better treatment is approved on the basis of (x) the standards for compromise and settlement and this Court's approval of the Global Set-

tlement Agreement, (y) the vote by 100% in number and 100% in dollar amount of Lenders voting on the Plan to accept the Plan and (z) the Committee's support for confirmation of the Plan.

(v) Under section 1123(a)(5), a plan must "provide adequate means for the plan's implementation." Section 5 of the Plan provides adequate means for implementation of the Plan.

(vi) Under section 1123(a)(6), a plan must "provide for the inclusion in the charter of the debtor, if the debtor is a corporation ..., of a provision prohibiting the issuance of nonvoting equity securities, and providing, as to the several classes of securities possessing voting power, an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends." The charter documents for each Debtor contain language satisfying section 1123(a)(6).

(vii) Under section 1123(a)(7), a plan must "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee." Section 5.8 of the Plan provides for the selection of officers and directors for the Reorganized Debtors. The initial Litigation Trustee

was identified in paragraph [59] above.

(viii) Under section 1123(a)(8), where a debtor is an individual, a plan must provide for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the plan. The Debtors are not individuals. Therefore, the provisions of section 1123(a)(8) of the Bankruptcy Code are inapplicable and thus satisfied.

85. The Plan provides for the assumption of certain of the Debtors' executory contracts and unexpired leases. Under section 365 of the Bankruptcy Code, a debtor may assume an executory contract or unexpired lease if (a) outstanding defaults under the contract or lease have been cured under section 365(b)(1) of the Bankruptcy Code, and (b) the debtor's decision to assume such executory contract or unexpired lease is supported by valid business justifications. Courts apply the "business judgment test," which requires a showing that the proposed course of action will be advantageous to the estate and the decision be based on sound business judgment. *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046–47 (4th Cir.1985) ("The issue ... is whether the decision of the debtor that rejection will be advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice."), *cert. denied*, 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986); *In re Constant Care Cmty. Health Center, Inc.*, 99 B.R. 697, 702 (Bankr.D.Md.1989) (same); *Eagle Bus*, 134 B.R. at 597 (confirming plan in which decisions regarding the assumption or rejection of executory contracts and unexpired leases were based on the debtors' sound business judgment and were in the best interests of the estate). In the absence of a showing of bad faith or an abuse of business discretion, the debtor's business judgment will not be altered. *NLRB v. Bildisco & Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir.1982), *aff'd*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984); *Lubrizol Enters.*, 756 F.2d at 1047. "Transposed to the bankruptcy context, the [business judgment] rule as applied to a bankrupt's decision to reject an executory contract because of perceived business advantage requires that the decision be accepted by courts unless it is shown that the bankrupt's decision was one taken in bad faith or in gross abuse of the bankrupt's retained business discretion." *Id.*

86. The Debtors' decisions pursuant to the Plan regarding the rejection and assumption of executory contracts and unexpired leases are based on sound business judgment and are necessary to the implementation of the Plan, and are in the best interests of the Debtors, their Estates, holders of Claims, and other parties-in-interest in the Debtors' Chapter 11 Cases. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984); *Lubrizol Enters.*, 756 F.2d at 1047. Section 6.2 of the Plan states the means by which all monetary defaults under each executory contract and unexpired lease are to be satisfied pursuant to section 365 of the Bankruptcy Code. All Cure Payments which may be required by section 365(b)(1) of the Bankruptcy Code under any executory contract or unexpired lease that are assumed under the Plan shall be made by the Debtors. Accordingly, the requirements of sections 1123(b)(2) and 365 of the Bankruptcy Code have been satisfied.

## X. The Plan Complies with Section 1129(a)(2) of the Bankruptcy Code

87. Pursuant to section 1129(a)(2) of the Bankruptcy Code, the Debtors have complied with the applicable provisions of title 11, including, specifically, sections 1125 and 1126 of the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order governing notice, disclosure and solicitation in connection with the Plan, the Disclosure Statement, and all other matters considered by the Bankruptcy Court in connection with the Chapter 11 Cases.

88. On September 10, 2009, after due notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order, which, *inter alia*, approved the Disclosure Statement, finding that it contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code and established procedures for the Debtors' solicitation of votes on the Plan.

89. In accordance with section 1125 of the Bankruptcy Code and pursuant to the Disclosure Statement Order, the Debtors (through KCC) solicited acceptances or rejections of the Plan from holders of Claims in each class of impaired Claims that are to receive distributions under the Plan. Classes 1 and 2 of the Plan are unimpaired, and as a result, pursuant to section 1126(f) of the Bankruptcy Code, holders of Claims in those classes are conclusively presumed to have accepted the Plan. Classes 3, 4 and 5 are impaired, receive distributions under the Plan, and have been solicited to vote on the Plan. Classes 6 and 7 are impaired, receive no distributions under the Plan, and as a result, pursuant to section 1126(g) of the Bankruptcy Code, holders of Claims in those classes are conclusively presumed to have rejected the Plan. The Debtors have complied with the applicable provisions of section 1126 of the Bankruptcy Code.

## Y. The Plan Complies with Section 1129(a)(3) of the Bankruptcy Code

90. Having examined the totality of the circumstances surrounding the Plan, the Bankruptcy Court has determined that the Plan was proposed in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code. The Plan achieves the rehabilitative and reorganizational goals of the Bankruptcy Code by restructuring the Debtors' obligations and providing the means through which the Debtors may continue to operate as a viable enterprise. Attendant to the continued operation of the enterprise is the ability of the Debtors to preserve jobs and continue business operations. The Plan is the result of arm's length discussions and negotiations among the Debtors, the Administrative Agent, the Committee and other key and relevant stakeholders. Significantly, the Plan incorporates the Global Settlement Agreement, which resolved significant litigation pending among the parties, as well as related proceedings and potential objections to confirmation of the Plan. The Plan, with its compromises and proposed treatments, clearly promotes the objectives and purposes of the Bankruptcy Code.

## Z. The Plan Complies With Section 1129(a)(4) of the Bankruptcy Code

91. Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees and expenses paid by the plan proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, be subject to approval of the court as reasonable. Section 1129(a)(4) of the Bankruptcy Code has been construed to require that all payments of professional fees made from estate assets be subject to review and approval by the Bankruptcy Court as to their

reasonableness. *See Heartland Fed Sav. & Loan Assoc. v. Briscoe Enters. Ltd, II (In re Briscoe Enters. Ltd, II)*, 138 B.R. 795, 816–17 (N.D.Tex.1992), *rev'd*, 994 F.2d at 1170 (court of appeals affirming bankruptcy court's ruling on payment of professional fees); *see also Mabey v. Sw. Elec Power Coop. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 515 (5th Cir. 1998), *cert. denied*, 526 U.S. 1144, 119 S.Ct. 2019, 143 L.Ed.2d 1031 (1999); *see, e.g., In re Anderson Grain Corp.*, 222 B.R. 528 (Bankr.N.D.Tex.1998).

92. Section 10.1 of the Plan provides that each Professional who holds or asserts a Professional Fee Claim incurred prior to the Effective Date, shall be required to file with the Bankruptcy Court and serve on all parties required to receive such notice, a request for payment no later than sixty (60) days after the Effective Date. Failure to file and serve such notice timely and properly results in the Professional Fee Claim being forever barred and discharged. A Professional Fee Claim that has been properly filed and served pursuant to Section 10.1 of the Plan shall become an Allowed Claim only to the extent allowed by Final Order.

93. The Bankruptcy Court previously approved interim application procedures under section 331 of the Bankruptcy Code, pursuant to which the Bankruptcy Court authorized and approved the interim and final payment of certain fees and expenses of professionals retained in the Chapter 11 Cases. All such fees and expenses, as well as all other accrued fees and expenses of Professionals through the Effective Date, remain subject to final review for reasonableness by the Bankruptcy Court under section 330 of the Bankruptcy Code. The foregoing procedures for the Bankruptcy Court's review and ultimate determination of fees and expenses paid satisfy the objec-

tives of section 1129(a)(4) of the Bankruptcy Code.

## AA. The Plan Complies With Section 1129(a)(5) of the Bankruptcy Code

94. Section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliations of the proposed officers, directors or voting trustee of the debtors after confirmation of the plan; that the appointment or continuance of such officers, directors or voting trustee be consistent with the interests of creditors and equity interest holders and with public policy; and that there be disclosure of the identity and compensation of any insiders to be retained or employed by the reorganized debtors. Section 5.8(a) of the Plan describes the process pursuant to which the members of the New Board for Reorganized Idearc will be determined. The identification of the New Board was disclosed in the Plan Supplement. Section 5.8(b) provides that The New Board shall appoint the directors of the Reorganized Subsidiaries to serve in their respective capacities after the Effective Date until replaced or removed in accordance with the Reorganized Subsidiary Governing Documents. Section 5.8(c) of the Plan provides that the officers of Idearc, who have previously been identified, shall continue to serve in their same respective capacities after the Effective Date. The officers of the Reorganized Subsidiaries, also previously described, shall continue to serve in their same respective capacities after the Effective Date and such officers were disclosed in the Disclosure Statement. The Disclosure Statement discloses the identity and compensation of any insiders to be retained or employed by the Reorganized Debtors. The identification of the proposed officers and directors of the Reorganized Debtors satisfies all re-

 of section 1129(a)(5) of the Bankruptcy Code.

## BB. The Plan Complies With Section 1129(a)(6) of the Bankruptcy Code

95. Section 1129(a)(6) of the Bankruptcy Code requires that any regulatory commission having jurisdiction over the rates charged by the reorganized debtor in the operation of its businesses approve any rate change provided for in the plan. 11 U.S.C. § 1129(a)(6). The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date. Therefore, the provisions of section 1129(a)(6) of the Bankruptcy Code are inapplicable and thus satisfied.

## CC. The Plan Complies with Section 1129(a)(7) of the Bankruptcy Code

 96. As set forth fully in the Debtors' liquidation analysis and by the evidence adduced in the Confirmation Hearing, the "best interests" test is satisfied as to all impaired classes of Claims and Idearc Interests which have not accepted the Plan. Furthermore, a liquidation under chapter 7 as set forth in the liquidation analysis would profoundly and adversely affect the ultimate proceeds available for distribution to all holders of Allowed Claims in the Chapter 11 Cases. Liquidation under chapter 7 would result in substantially smaller distributions being made to creditors than those provided for under the Plan due to, *inter alia*, (a) the value of the Debtors' real and personal property interests is small in comparison to the going concern value of the business; (b) the anticipated erosion in value of assets in the context of the expeditious liquidation required under chapter 7 and the "forced sale" environment in which such a liquidation would likely occur; (c) the limi-

tations of section 721 of the Bankruptcy Code; (d) loss of value through the passage of time; (e) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a chapter 7 trustee for bankruptcy and other necessary professional advisors; (f) the adverse effects on the salability of business segments as a result of the likely departure of key employees and the loss of customers; (g) the substantial increases in Claims which would have to be satisfied on an administrative or priority basis or on parity with creditors in the Chapter 11 Cases; and (h) the likelihood of contentious litigation by and between parties-in-interest and the high costs attendant thereto. Finally, consummation of the Debtors' Plan is not likely to be followed by liquidation or the need for further financial reorganization.

97. In the context of the erosion of the asset values and the increased costs and delay associated with the administration of a chapter 7 case, confirmation of the Plan provides each rejecting creditor and interest holder with a recovery that is not less than such holder would receive in a chapter 7 liquidation of the Debtors.

98. Based upon the foregoing, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code. Therefore, the "best interests" test is satisfied with respect to Classes 4, 6 and 7.

## DD. The Plan Complies with Sections 1129(a)(8) and (b)(1) of the Bankruptcy Code

99. Section 1129(a)(8) is satisfied with respect to the Claims in Classes 1 and 2 as such Claims are not impaired under the Plan and are conclusively presumed to have accepted the Plan in accordance with section 1126(f) of the Bankruptcy Code.

100. Based on the Record and uncontroverted evidence, on an unconsolidated basis, Classes 3 and 5, both of which were impaired, accepted the Plan.

101. Accordingly, other than Classes 4, 6 and 7 (each of which is subject to the "cram down" provisions of section 1129(b) of the Bankruptcy Code, as discussed below), section 1129(a)(8) of the Bankruptcy Code is satisfied.

## EE. The Plan Complies with Section 1129(a)(9) of the Bankruptcy Code

102. Section 1129(a)(9) of the Bankruptcy Code requires that persons holding claims entitled to priority under section 507(a) of the Bankruptcy Code receive specified cash payments under the plan. *See* 11 U.S.C. § 1129(a)(9).

103. Consistent with section 1129(a)(9)(A), Section 3.1(a) of the Plan provides that each holder of an Allowed Administrative Claim shall receive (A) Cash equal to the unpaid portion of such Allowed Administrative Claim or (B) such different treatment as to which the applicable Debtor and such holder shall have agreed upon in writing; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, on or before the Initial Distribution Date, or shall receive such other treatment as agreed upon in writing by the Debtors and such holder; *provided, however,* that an Administrative Claim representing a liability incurred in the ordinary course of business by the Debtors' Estates may be paid in the ordinary course of business by the Debtors' Estates.

104. Consistent with section 1129(a)(9)(A), Section 10.1 of the Plan provides that all Allowed Professional Fee Claims shall be paid by the Debtors.

105. As required by section 1129(a)(9)(B) of the Bankruptcy Code, Sec-

tion 3.2(a) of the Plan provides that, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights of each holder of an Allowed Other Priority Claim will be reinstated and retained, except as provided in section 1124(2)(A)-(C) of the Bankruptcy Code and the holders of such Claims will be paid in full.

106. Consistent with section 1129(a)(9)(C) of the Bankruptcy Code, Section 3.1(b) of the Plan provides that each holder of an Allowed Priority Tax Claim or Allowed Secured Tax Claim shall receive (a) regular installments payable in Cash, over a period not exceeding five years after the Petition Date, having a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (b) such different treatment as to which the applicable Debtor and such holder have agreed in writing; provided, that such treatment is on more favorable terms to the Debtors (or the Reorganized Debtors after the Effective Date), than the treatment set forth in clause (a) above; or (c) payment in full in Cash on the later of the Distribution Date or the date on which such Claim becomes an Allowed Claim. Each holder of an Allowed Priority Tax Claim or Allowed Secured Tax Claim shall not receive any Cash or other distribution on account of a penalty on, with respect to, or arising in connection with, such Allowed Priority Tax Claims or Allowed Secured Tax Claims. All penalties on, with respect to, or arising in connection with, any Priority Tax Claim or Secured Tax Claim shall be treated as Class 4 General Unsecured Claims. Based upon the foregoing, the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

## FF. The Plan Complies with Section 1129(a)(10) of the Bankruptcy Code

107. Class 3 Secured Credit Facility Claims against each of the Debtors has

voted as a Class to accept the Plan. Class 5 Convenience Claims is deemed to have accepted the Plan. The holders of Class 3 Secured Credit Facility Claims are not "insiders" as such term is defined in the Bankruptcy Code. Thus, for each of the Debtors, at least one non-insider class of impaired creditors accepted the Plan.

### GG. The Plan Complies with Section 1129(a)(11) of the Bankruptcy Code

108. Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan. *See* 11 U.S.C. § 1129(a)(11). The Plan proposes a reorganization of the Debtors' assets.

109. The feasibility test set forth in section 1129(a)(1 1) requires the Bankruptcy Court to determine whether the Plan is workable and has a reasonable likelihood of success. *Fin. Sec. Assurance Inc. v. T–H New Orleans Ltd., P'ship (In re T–H New Orleans Ltd. P'ship)*, 116 F.3d 790, 801 (5th Cir.1997); *In re Cajun Elec. Power Coop., Inc.*, 230 B.R. 715, 744–45 (Bankr.M.D.La.1999); *In re M & S Assocs.*, 138 B.R. 845, 848–49 (Bankr. N.D.Tex.1992); *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 506 (Bankr.S.D.Tex. 1989); *see also In re Leslie Fay Cos., Inc.*, 207 B.R. 764, 788–89 (Bankr.S.D.N.Y. 1997). The Fifth Circuit has provided that "the [bankruptcy] court need not require a guarantee of success ..., [o]nly a reasonable assurance of commercial viability is required.' All the bankruptcy court must find is that the plan offer 'a reasonable probability of success.'" *T–H New Orleans*, 116 F.3d at 801 (quoting *Briscoe Enters.*, 994 F.2d at 1165–66; *In re Land-*

*ing Assocs., Ltd.*, 157 B.R. 791, 820 (Bankr.W.D.Tex.1993)) (additional citations omitted); *see also Cajun Elec.*, 230 B.R. at 745; *Landing Assocs.*, 157 B.R. at 819; *M & S Assocs.*, 138 B.R. at 849; *Lakeside Global*, 116 B.R. at 506–07.

110. To establish the feasibility of a plan, the debtor must present proof through reasonable projections that there will be sufficient cash flow to fund the plan. Such projections cannot be speculative, conjectural or unrealistic. *M & S Assocs.*, 138 B.R. at 849. A plan proponent, however, need only demonstrate that there exists a reasonable probability that the plan provisions can be performed. *T–H New Orleans*, 116 F.3d at 801 (quoting *Landing Assocs.*, 157 B.R. at 820). "However, just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility." *Cajun Elec.*, 230 B.R. at 745. The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds since a guarantee of the future is not required. *See id.; see also In re U.S. Truck Co., Inc.*, 47 B.R. 932, 944 (E.D.Mich.1985), *aff'd*, 800 F.2d 581 (6th Cir.1986).

111. For purposes of determining whether the Plan satisfies the feasibility standard, the Debtors, their professional advisors, as well as other parties-in-interest, have analyzed the ability of the Debtors to fulfill their obligations under the Plan. As part of this analysis, the Debtors have prepared projections of their financial performance for each of the five fiscal years 2009–2013. Based on the Record, the Bankruptcy Court concludes that the Debtors will have sufficient means to meet all of their obligations under the Plan, including without limitation, obligations arising under or in connection with the New Term Loans to be issued under the Plan to holders of Class 3 Secured Credit

Facility Claims. The Record provides ample support in order to determine that the Reorganized Debtors will emerge from bankruptcy as a viable, financially healthy business enterprise, unlikely to be in need of further financial reorganization.

112. Based on the foregoing, the Plan satisfies the feasibility standard of section 1129(a)(11).

## HH. The Plan Complies with Section 1129(a)(12) of the Bankruptcy Code

113. Section 10.3 of the Plan provides that the Debtors or Reorganized Debtors, as the case may be, shall be responsible for timely payment of United States Trustee quarterly fees incurred pursuant to 28 U.S.C. § 1930(a)(6). Any fees due as of the date of confirmation of the Plan will be paid in full on the Effective Date. After confirmation, the Reorganized Debtors shall pay United States Trustee quarterly fees as they accrue until these Chapter 11 Cases are closed by the Bankruptcy Court. The Plan accordingly satisfies section 1129(a)(12) of the Bankruptcy Code.

## II. The Plan Complies with Section 1129(a)(13) of the Bankruptcy Code

114. Section 1129(a)(13) of the Bankruptcy Code requires that the plan continue after its effective date all retiree benefits at the level established pursuant to section 1114(e)(1)(B) or (g) of the Bankruptcy Code, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits. *See* 11 U.S.C. § 1129(a)(13). Pursuant to the Plan and the Confirmation Order, on or after the Effective Date, all retiree benefits,[8] if any, will continue to be paid in accordance with applicable law. Accordingly, the Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

## JJ. The Plan Complies with Section 1129(a)(14) of the Bankruptcy Code

115. Section 1129(a)(14) of the Bankruptcy Code requires if the debtor is required by a judicial or administrative order, or by statute, to pay a domestic support obligation, the debtor must have paid all amounts payable under such order or such statute for such obligation that first become payable after the date of the filing of the petition. *See* 11 U.S.C. § 1129(a)(14). The Debtors are not required by a judicial or administrative order, or by statute, to pay any domestic support obligation; accordingly, the Plan satisfies the requirements of section 1129(a)(14) of the Bankruptcy Code.

## KK. The Plan Complies with Section 1129(a)(15) of the Bankruptcy Code

116. Section 1129(a)(15) of the Bankruptcy Code requires that if the debtor is an individual, and the holder of an allowed unsecured claim has objected to confirmation of the plan, the property to be distributed to the holder must be not less than the value required by section 1129(a)(15). *See* 11 U.S.C. § 1129(a)(15). The Debtors are not individuals; accordingly, the Plan

---

8. As defined in section 1114 of the Bankruptcy Code, "Retiree Benefits" means payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependants, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under the Bankruptcy Code.

satisfies the requirements of section 1129(a)(15) of the Bankruptcy Code.

## LL. The Plan Complies with Section 1129(a)(16) of the Bankruptcy Code

117. Section 1129(a)(16) of the Bankruptcy Code requires that all transfers of property of the plan shall be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation of trust. *See* 11 U.S.C. § 1129(a)(16). All transfers of property under the Plan will be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation of trust; accordingly, the Plan satisfies the requirements of section 1129(a)(16) of the Bankruptcy Code.

## MM. The Plan Complies with Section 1129(b) of the Bankruptcy Code

118. Certain classes of Claims and Idearc Interests did not vote to accept the Plan. Specifically, Class 4 voted to reject the Plan (although holders of a majority in number and dollar amount of claims in such Class voted to accept the Plan), and Classes 6 and 7 are impaired and deemed to reject the Plan.[9] Despite Class 4's rejection of the Plan, the Committee and the MatlinPatterson Entities support confirmation of the Plan, which incorporates the terms of the Global Settlement Agreement. Additionally, no party has objected

to the Plan's "cram down" of Class 4. Accordingly, Classes 4, 6 and 7 are subject to "cram down" pursuant to section 1129(b) of the Bankruptcy Code.

119. Section 1129(b) of the Bankruptcy Code provides that if all applicable requirements of section 1129(a) are met, save for section 1129(a)(8), a Plan may be confirmed so long as it does not discriminate unfairly and it is fair and equitable with respect to each class of claims and equity interests that is impaired and has not accepted the Plan. *See* 11 U.S.C. § 1129(b)(1). Thus, to confirm a plan that has not been accepted by all impaired classes (thereby failing section 1129(a)(8)), the plan proponent must show that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes. *See Sentry Operating*, 264 B.R. at 862; *Landing Assocs.*, 157 B.R. at 821; *Eagle Bus*, 134 B.R. at 601.

120. The Bankruptcy Court finds, as set forth below, that the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to Classes 4, 6 and 7. Accordingly, the Debtors have satisfied the "cram down" requirements in section 1129(b) of the Bankruptcy Code to confirm the Plan over Classes 4, 6 and 7.

### (1) The Plan Is Fair And Equitable With Respect To Classes 4, 6 And 7, Which Did Not Vote To Accept The Plan

121. Sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) provide that a plan is fair and equitable with respect to a class of

---

**9.** Class 6 is comprised of Claims against any of the Debtors that are subordinated pursuant to either Section 510(b) or 510(c) of the Bankruptcy Code, which includes any Claim arising from the rescission of a purchase or sale of any Old Security, any Claim for damages arising from the purchase or sale of an Old

Security, or any Claim for reimbursement, contribution, or indemnification on account of any such Claim. No ballots were cast by Creditors asserting claims in Class 6 and the Debtors are unaware of any creditors in that Class at this time.

impaired unsecured claims or equity interests that has not voted to accept the plan if the plan provides that the holder of any claim or interest that is junior to the claims or equity interests of such class will not receive or retain under the plan on account of such junior claim or interest any property. *See* 11 U.S.C. §§ 1129(b)(2)(B)(ii) and (C)(ii).[10] This central tenet of bankruptcy law—the "absolute priority rule"—requires that if the holders of claims or interests in a particular class receive less than full value for their claims or interests, no holders of claims or equity interests in a junior class may receive property under the plan. *See 203 North LaSalle St. P'ship*, 526 U.S. at 441–42, 119 S.Ct. 1411 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii). That latter condition is the core of what is known as the 'absolute priority rule.'").

122. The corollary of the absolute priority rule is that senior classes cannot receive more than a one hundred percent (100%) recovery for their claims. *See In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr.S.D.N.Y.2007) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claim, and that excess value must be allocated to junior classes of debt or equity, as the case may be."); *In re Trans Max Techs., Inc.*, 349 B.R. 80, 89 (Bankr.D.Nev. 2006) ("One component of the fair and equitable treatment is that a plan may not pay a premium to a senior class."); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 612 (Bankr.D.Del.2001) ("A corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims."); *In re Victory Constr. Co.*, 42 B.R. 145, 155 (Bankr. C.D.Cal.1984) ("It is clear that the drafters intended the court to deny confirmation where the plan proposes to pay more than 100 percent to a senior class without the consent of a junior.").

123. The Plan satisfies the absolute priority rule with respect to unsecured claims in Classes 4 and 6 pursuant to section 1129(b)(2)(B)(ii) of the Bankruptcy Code. No holder of a claim or interest that is junior to Classes 4 and 6 will receive any distribution on account of such junior claim or interest. In particular, holders of Subordinated Claims in Class 6, which is junior to Class 4, will not receive or retain any property on account of such claims. *See* Plan, § 3.4(a).[11] Similarly, holders of Idearc Interests in Class 7, which is junior to Classes 4 and 6, will not receive or retain any property on account of their Idearc Interests. *See* Plan, § 3.4(b). Further, no holder of a Claim that is senior to Class 4 or 6 will receive more than one hundred percent (100%) payment for its Claim. The Plan provides that holders

---

10. Section 1129(b)(2)(A), which sets forth the absolute priority rule as to secured claims, is not applicable here because (i) Claims in Class 2 are not impaired under the Plan and thus deemed to accept the Plan and (ii) Class 3 voted to accept the Plan.

11. Holders of Convenience Claims in Class 5 will receive a Cash payment equal to 25% of their Allowed Convenience Claims, up to a maximum of $2,500. However, for purposes of section 1129(b)(2)(B)(ii), Class 5 is not "junior" to Class 4 because claimants in both classes hold non-priority, unsecured Claims and are thus of equal priority with respect to distributions from the Debtors' Estates.

of Allowed Other Priority Claims in Class 1 will be paid in full in Cash. *See* Plan, § 3.2(a). The Plan provides that holders of Allowed Other Secured Claims in Class 2 will have their legal, equitable, and contractual rights Reinstated. *See* Plan, § 3.2(b). The Plan provides that holders of Allowed Secured Credit Facility Claims in Class 3 will receive distributions equal to the full amount of their Claims. *See* Plan, § 3.3(a). Finally, as applicable to Class 6, holders of Allowed unsecured Claims in Class 4 will receive less than the full amount of their Claims. *See* Plan, § 3.3(b). Accordingly, the "cram down" of Classes 4 and 6 is appropriate under section 1129(b)(2)(B)(ii) of the Bankruptcy Code.

124. The Plan also satisfies the absolute priority rule with respect to Idearc Interests in Class 7 pursuant to section 1129(b)(2)(C)(ii) of the Bankruptcy Code. The uncontroverted evidence demonstrates that the reorganization value of the Debtors is substantially less than the aggregate amount of Allowed Claims. Moreover, holders of Claims in Class 3 are not receiving more than 100% of their Allowed Claims. Because Class 7 represents the lowest priority of any interests in the Debtors, there are no holders of any interests that are junior to the interests of Class 7 that are receiving or retaining anything under the Plan. Moreover, as noted above, no holder of any claim in Classes 1 through 6, which are senior to Class 7, shall receive property under the Plan with a value of more than 100% of their Allowed Claims. Accordingly, the "cram down" of Class 7 is appropriate under section 1129(b)(2)(C)(ii) of the Bankruptcy Code. Therefore, the Plan satisfies the requirements of sections 1129(b)(2)(B) and 1129(b)(2)(C) for all Classes of Claims and Idearc Interests that did not vote to accept the Plan and is thus fair and equitable with respect to those Classes.

**(2) The Plan Does Not Unfairly Discriminate With Respect To Classes 4, 6 and 7, Which Did Not Vote To Accept The Plan**

125. The Plan also does not discriminate unfairly with respect to Classes 4, 6 and 7, which rejected the Plan. The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists. *See 203 N. LaSalle*, 190 B.R. at 585 (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a chapter 11 plan" and that "the limits of fairness in this context have not been established"). Rather, courts may examine the facts and circumstances of the particular case to determine whether unfair discrimination exists. *See In re Johns–Manville Corp.*, 68 B.R. 618, 636 (Bankr.S.D.N.Y.1986) ("The language and legislative history of the statute provides little guidance in applying the 'unfair discrimination' standard."); *see, e.g., In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr.W.D.Okla.1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances"); *In re Aztec Co.*, 107 B.R. 585, 589 (Bankr.M.D.Tenn.1989) (noting that courts "have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination"). At a minimum, however, the unfair discrimination standard prevents creditors and equity interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so. *In re Johns–Manville Corp.*, 68 B.R. 618, 636 (Bankr.S.D.N.Y.1986) (segregating two similar claims into separate classes and

providing disparate treatment for the classes is unfairly discriminatory); *see, e.g., In re Ambanc La Mesa Ltd. P'ship,* 115 F.3d 650, 656 (9th Cir.1997); *Aztec,* 107 B.R. at 589–91.

126. Here, the Plan's treatment of Claims in Classes 4 and 6 and Idearc Interests in Class 7, the only impaired Classes that rejected the Plan, is not unfairly discriminatory, for similarly situated holders of Claims or Idearc Interests will receive substantially similar treatment irrespective of Class.

127. As to Class 4, the differing treatment of Claims in each Sub–Class is not unfairly discriminatory. All holders of Allowed unsecured Claims will have the option of receiving the same treatment under the Plan on account of those Claims, by participating in Sub–Class 1 of Class 4. Holders of Allowed Unsecured Note Claims and Allowed Unsecured Credit Facility Claims are automatically in Sub–Class 1 of Class 4, and holders of Allowed General Unsecured Claims have the ability to opt out of Sub–Class 2 of Class 4 and elect to receive the treatment in Sub–Class 1. *See* Plan, § 3.3(b). Furthermore, even if holders of Allowed General Unsecured Claims elect to stay in Sub–Class 2, the treatment afforded to Sub–Class 2 is not unfairly discriminatory to Sub–Class 1. The Bankruptcy Court recognizes that no holders of Allowed Unsecured Note Claims or Allowed Unsecured Credit Facility Claims in Sub–Class 1, nor the Committee (on behalf of all unsecured creditors), have objected to the Sub–Class 2 treatment. Moreover, the difference in treatment is insignificant since the fund from which distributions will be made for Sub–Class 2 is capped at $3.0 million, whereas the fund from which distributions will be made for Sub–Class 1 is $120.0 million.

128. Finally, because the $3.0 million fund from which distributions will be made for Sub–Class 2 is being gifted from the Lenders' collateral—and will not be made from the Debtors' assets—any slight discrimination that could exist against claimants in Sub–Class 1 in favor of claimants in Sub–Class 2 does not violate the Bankruptcy Code. *See In re Journal Register Co.,* 407 B.R. 520 (Bankr. S.D.N.Y.2009) (finding that gift plan did not unfairly discriminate under section 1123(a)(4) of the Bankruptcy Code because removing the gift from the plan would not change the recovery of the objecting creditors, and so the creditors that received the gift did not do so at the expense of other creditors in the same class). *See also, In re WorldCom Inc.,* No. 02–13533, 2003 WL 23861928 (Bankr.S.D.N.Y. Oct.31, 2003) (approving gift from class of creditors, instead of individual, where class voted in favor of gift); *In re Genesis Health Ventures Inc.,* 266 B.R. 591 (Bankr.D.Del. 2001) (approving gift to subordinated debtholders of a 14 percent recovery while certain holders of claims senior to the subordinated debt were to receive no distribution); *In re MCorp. Fin. Inc.,* 160 B.R. 941 (S.D.Tex.1993) (senior creditor gave up portion of recovery to nonsubordinated unsecured creditor in connection with settlement of litigation); *In re SPM Manufacturing Corp.,* 984 F.2d 1305 (1st Cir. 1993) (approving secured creditor's gift of a portion of the property securing its lien to the creditors' committee for the benefit of unsecured creditors).

129. Similarly, to the extent the treatment of unsecured Convenience Claims in Class 5 could be more favorable than the treatment of unsecured claims in Class 4, it is not unfairly discriminatory. The creation of the Class 5 Convenience Class is reasonable and necessary for administrative convenience because it reduces the number and amount of electing Claims over $10,000 and separate review of

electing Claims would consume the Debtors' resources with very little benefit. *See* 11 U.S.C. § 1122(b) (separate administrative convenience class permissible); *see also In re Leser*, 939 F.2d 669, 671 n. 4 (8th Cir.1991) (stating that the purpose of section 1122(b) is "to allow special treatment for small claims, so that they [can] be eliminated early and reduce the number of claims that would have to be paid over time."); *Troy Sav. Bank v. Travelers Motor Inn, Inc.*, 215 B.R. 485, 489 (N.D.N.Y. 1997) (explaining that convenience classes are authorized under section 1122(b) so that unsecured creditors with relatively small claims can "receive their percentage immediately upon confirmation, rather than making tiny payments over a period of years like the bigger unsecured claims"); *In re Jartran, Inc.*, 44 B.R. 331, 397 (Bankr.N.D.Ill.1984) (holding that "the purpose and intended goal of § 1122(b) is the reduction of administrative costs accomplished by reducing the number of claims to be dealt with postpetition"). Further, any Class 4 claimant has the option of electing to reduce its claim and receive treatment under Class 5. COLLIER ON BANKRUPTCY ¶ 1129.03[3][c][ii] (16th ed.2009) (no unfair discrimination if members in dissident class have opportunity to become members of convenience class by reducing their claims to convenience threshold). Thus, any instances of differing treatment under the Plan in regards to the Convenience Claim treatment in Class 5, are justified and permitted under section 1122(b) of the Bankruptcy Code and applicable law and do not unfairly discriminate against unsecured Claims in Class 4.

 130. Similarly, all claims in Class 6 are subordinated to the same priority as Idearc Interests in Class 7. Because Classes 6 and 7 receive identical treatment under the Plan, i.e., no distributions to either Class, the Plan does not unfairly discriminate against Class 6. *See, e.g., In re Dana Corp.*, No. 06–10354, 2007 WL 4589331, at *16 (Bankr.S.D.N.Y. Dec.26, 2007) (plan does not "discriminate unfairly" when non-accepting class is treated substantially equally to similarly situated classes).

 131. As to Class 7, each holder of an Idearc Interest is receiving the same treatment, i.e., no distributions on account of such interest, as every other holder of an Idearc Interest will receive on account of such interest. Further, because all Idearc Interests must be extinguished in order for the Plan to satisfy the absolute priority rule as to non-accepting Classes 4 and 6, the Plan does not unfairly discriminate against holders of Idearc Interests in Class 7. *In re Leslie Fay Cos., Inc.*, 207 B.R. 764, 791 n. 37 (Bankr.S.D.N.Y.1997).

132. Thus, the Bankruptcy Court finds that the Plan does not unfairly discriminate with respect to Classes 4, 6 and 7 and the "cram down" test is satisfied.

## NN. The Plan Complies with Section 1125(e) of the Bankruptcy Code

133. Based on the Record in these Chapter 11 Cases, the Debtors and each of their respective current or former officers, directors, members, employees, agents, representatives, advisors, and attorneys have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to the solicitation of acceptances to the Plan.

134. To the extent that there is a conflict between the terms and conditions of the Confirmation Order and the Findings and, the terms and conditions of the Confirmation Order shall govern.

## SUMMARY

135. The Plan meets the requirements of chapter 11 of the Bankruptcy Code and should be confirmed. An order consistent with these Findings and Conclusions will be entered.

## Exhibit 1

## (Global Settlement Motion)

## [Docket No. 1634]

### JOINT MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS, DEBTORS, JPMORGAN CHASE BANK, N.A., AS AGENT, AND CERTAIN MATLINPATTERSON ENTITIES, PURSUANT TO SECTIONS 105(a), 1128 AND 1129 OF THE BANKRUPTCY CODE AND FED. R. BANKR. P. 9019(a), FOR AN ORDER APPROVING GLOBAL SETTLEMENT IN SUPPORT OF PLAN OF REORGANIZATION

The Official Committee of Unsecured Creditors (the *"Creditors' Committee"*) of Idearc Inc. (*"Idearc"*) and its affiliated debtors in possession (together with Idearc, the *"Debtors"*)[1], the Debtors, JPMorgan Chase Bank, N.A. (the *"Agent"*), as Administrative Agent for the pre-petition secured lenders owed approximately $7 billion by the Debtors on account of loans and other financial accommodations (the *"Lenders"*), and MatlinPatterson Global Opportunities Partners III LP and MatlinPatterson Global Opportunities (Cayman) III LP, the Debtors' largest bondholder, (collectively *"MatlinPatterson"*, and together with the Creditors' Committee, the Debtors, and the Agent, the *"Parties"*), by and through their undersigned counsel, hereby respectfully submit this joint motion (the *"Motion"*), pursuant to section 105(a) of title 11 of the United States Code (the *"Bankruptcy Code"*) and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the *"Bankruptcy Rules"*), for approval of a settlement of this adversary proceeding (the *"Settlement"*) to pave the way for a consensual plan of reorganization, and in support of the Motion respectfully represent as follows:

## I. PRELIMINARY STATEMENT

1. The Creditors' Committee commenced this adversary proceeding in order to challenge certain of the Agent's liens and the valuation and allocation of the Debtors' unencumbered property, if any, pursuant to the Debtors' proposed plan of reorganization. The Creditors' Committee contended that there are significant unencumbered assets, including the Debtors' copyrights and related revenue streams, and rights to use the Verizon brand, as well as post-petition revenue streams, and that the value of such assets should be distributed to unsecured creditors. The Agent rejected the Creditors' Committee's contentions, maintaining that (a) the Agent held a perfected pre-petition lien, for the benefit of the Lenders, on substantially all of the Debtors' assets, (b) the Creditors' Committee's challenges to the Agent's liens on the Verizon brand and the revenues associated with the Debtors' copyrights were without any merit, (c) the value of the Debtors' copyrights were *de minimis*, and (d) the challenge to the Agent's lien on post-petition revenues was defeated, among other things, by the diminution in value of the Debtors' estates

---

1. The Debtors include Idearc Inc., Idearc Information Services LLC, Idearc Media LLC, Idearc Media Services—East Inc., Idearc Media Services—West Inc., Idearc Media Sales—West Inc., Idearc Media Sales—East LLC, Idearc Media Sales—East Co., License Application Corporation, and Second License Application Corporation.

since the bankruptcy filing, and the Agent's right to be adequately protected by receiving a post-petition replacement lien on whatever unencumbered property existed. This litigation ensued, extensive discovery was taken, and trial commenced and was conducted on November 9th and 10th.

2. Now, following the commencement of trial on the myriad legal and factual issues implicated in this dispute, the Parties have reached a global resolution of all issues. The Settlement described herein preserves a significant recovery to the Lenders on account of their secured claims, while significantly increasing the consideration to be paid to Class 4 unsecured creditors under the Debtors' plan of reorganization, and paves the way for the Debtors' prompt emergence from Chapter 11.

3. By this Motion, the Creditors' Committee, the Debtors, the Agent, and MatlinPatterson seek approval of their agreement resolving all outstanding and threatened litigation among the Parties. In consideration of such resolution, the Parties have agreed that:

- Claims filed by the Agent on behalf of the Lenders will be allowed as of the Petition Date at $4 billion, and allowed for purposes of the Plan, as secured claims in the amount of $3.75 billion (after giving effect to the $250 million adequate protection payment made pursuant to the Cash Collateral Order), with the approximately $3.03 billion remainder of the claims allowed as unsecured deficiency claims; and unsecured note claims will be allowed as unsecured claims in the amount of approximately $2.936 billion.

- The Lenders will waive the right to receive distributions on account of their unsecured deficiency claim, ex-

cept with respect to Litigation Trust proceeds in excess of $30 million, as noted below.

- The Plan will be modified to provide that:

 - The Lenders will receive on account of their secured claims their pro rata share of (a) $2.75 billion of term loans contemplated by the Plan, with no changes to the terms thereof, (b) Distributable Cash (inclusive of the $250 million adequate protection payment made pursuant to the Cash Collateral Order) estimated to be approximately $725 million (rather than the prior estimate of approximately $850 million), (c) prior to any election to receive cash pursuant to the Paulson Backstop (as defined below), 85% of the New Common Stock (rather than 97.5% as set forth in the current Plan) and (d) approximately 50% of any Litigation Trust proceeds in excess of $30 million.

 - Class 4 claims will receive their pro rata share of $120 million in cash (as opposed to no cash distribution under the current Plan); and prior to any election to receive cash pursuant to the Paulson Backstop, 15% of the shares of the New Common Stock to be issued and outstanding under the Plan (rather than 2.5% as set forth in the current Plan), plus an interest in the Litigation Trust.

 - Holders of non-bank, non-bond General Unsecured Claims will receive a cash payment equal to the lesser of 25% of the face value of such claims, or their pro rata share of $3 million; provided such creditors may elect to receive the same treatment as bondholders.

- Litigation trust funding will be increased from $250,000 to $2.5 million.
- The first $30 million in proceeds from the Litigation Trust shall be distributed to bondholders and holders of General Unsecured Claims electing to be treated as bondholders; thereafter, Litigation Trust proceeds will be distributed pro rata to all Class 4 claims (including the Lenders' unsecured deficiency claim).
- Claims against the Lenders and bondholders arising in connection with the Debtors, including claims arising from the spinoff of Idearc from Verizon Communications, Inc., shall be released. For the avoidance of doubt, claims against Verizon Communications Inc., its affiliates, its officers and directors (together "*Verizon*") are not released and Verizon is not included as a "Lender" for purposes of this Motion and Settlement.
- The Creditors' Committee and MatlinPatterson agree not to file or otherwise raise any objections to the Plan.
- The Adversary Proceeding and any other litigation commenced by the Creditors' Committee, including pending motions for reconsideration of the Final Cash Collateral Order and to abandon certain claims and causes of action, will be dismissed with prejudice.
- MatlinPatterson's separate adversary proceeding against the Agent and the Lenders, its objection to the Agent's and Lenders' claims and liens, and its motion for reconsideration of the Final Cash Collateral Order, will be dismissed with prejudice.
- The Creditors' Committee agrees to support, and the Debtors and the Agent agree not to object to any claim for substantial contribution brought by MatlinPatterson, provided such claim does not exceed $3 million.
- Confirmation of the Plan will be conditioned on approval of this Settlement.
- In the event that the Court denies approval of the Settlement, or the Plan, as modified, is not confirmed or does not become effective, the Parties' agreement will terminate and be void, all of the statements, admissions, consents, and agreements contained in this Motion shall be void; and neither the Creditors' Committee, the Debtors, MatlinPatterson nor the Agent may use or rely on any such statement, admission, consent or agreement in any public statement or litigation involving the Parties.

4. The Debtors have made significant progress in confirming their plan of reorganization. Indeed, the Debtors have obtained Court authority to and entered into an agreement with a standby equity purchaser which has agreed to purchase up to 45% of the New Common Stock from holders of Class 3 and Class 4 Claims at a per share price of $17.33, based on an aggregate equity valuation for the Debtors of $260 million ($60 million more than the midpoint of the Plan's implied equity valuation). By resolving the legal and factual challenges in both this Adversary Proceeding and the Creditors' Committee's and MatlinPatterson's potential challenges to the Plan, this settlement resolves perhaps the most significant obstacle to confirmation. Moreover, by improving the treatment of the unsecured creditors, the Parties believe that the Debtors do not have to expend the time necessary to resolicit the Plan to unsecured creditors. The Creditors' Committee believes the economic value of the Settlement is well within the range of potential outcomes of the Adversary Proceeding. Because the Settlement

will expedite the Debtors' emergence from chapter 11, and reduce the drain on the Debtors' estate caused by protracted litigation, the Parties respectfully request that the Court approve the Settlement on the terms set forth herein.

## II. *JURISDICTION AND VENUE*

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The statutory predicates for relief are sections 105(a), 1128 and 1129 of the Bankruptcy Code and Bankruptcy Rule 9019.

## III. *PROCEDURAL BACKGROUND*

### A. *Chapter 11 Filing*

6. On March 31, 2009, Idearc and nine of its affiliates each filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the *"Petition Date"*). The cases of each of the Debtors are being jointly administered with that of Idearc.

### B. *Creditors' Committee*

7. On April 14, 2009, the United States Trustee appointed the Creditors' Committee, which appointment was subsequently amended. No other official committees have been appointed or designated in these chapter 11 cases.

## IV. *SUMMARY OF UNDERLYING CONTROVERSY*

### A. *Cash Collateral Order*

8. On April 29, 2009, the Court entered the Final Order Authorizing Use of Cash Collateral (the *"Final Cash Collateral Order"*), establishing and implementing procedures for the Debtors' use of the Lenders' Cash Collateral. Pursuant to the Final Cash Collateral Order, the Debtors acknowledged the validity of both the Agent's and Lenders' claims and the liens securing them, subject to the right of parties in interest, including the Creditors' Committee, challenging such claims and liens. The Cash Collateral Order set July 13, 2009 as the deadline for filing actions to challenge the validity or extent of the Agent's and Lenders' pre-petition claims and liens (the *"Lien Challenge Deadline"*). The Agent subsequently agreed to extend the Lien Challenge Deadline to August 4, 2009, solely for the Creditors' Committee.

9. The Final Cash Collateral Order prevents the Debtors or the Creditors' Committee from using Cash Collateral to, among other things, challenge the validity or extent of the Lenders' claims and liens. *See* Cash Collateral Order at ¶ 25 (providing that "in no event shall the Cash Collateral or the Carveout be used for the payment or reimbursement of any fees, expenses, costs or disbursements of any of the professionals incurred in connection with . . . challenging the Pre–Petition Obligations, invalidating, setting aside, avoiding or subordinating in whole or part the Agent's liens and security interests granted pursuant to the Loan Documents").

### B. *Reconsideration Motions*

10. On July 6, 2009, MatlinPatterson filed a Motion to Reconsider the Final Cash Collateral Order (the *"MatlinPatterson Reconsideration Motion"*). On July 10, 2009, both the Debtors and the Agent objected to the MatlinPatterson Reconsideration Motion.

11. On July 8, 2009, the Creditors' Committee filed a Motion for Reconsideration of the Final Cash Collateral Order (the *"Cash Collateral Reconsideration Motion"*) seeking reconsideration of the Final Cash Collateral Order. On July 17, 2009, both the Debtors and the Agent objected

to the Cash Collateral Reconsideration Motion.

### C. Abandonment Motion

12. On July 6, 2009, the Creditors' Committee filed its motion seeking to abandon certain of claims against the Lenders that may be subject to the safe harbor provisions of the Bankruptcy Code (the "*Abandonment Motion*"). On July 16, 2009, the Debtors filed a Response to the Abandonment Motion, and on July 17, 2009, JPMC filed a Response to the Abandonment Motion.

### D. Stipulation Granting Derivative Standing

13. On July 13, 2009, this Court entered the Stipulation and Order Conferring Standing on the Creditors' Committee, authorizing the Creditors' Committee to pursue certain causes of action on behalf of the Debtors' estates against JPMC and the Lenders (the "*Standing Stipulation*"). Pursuant to the Standing Stipulation, the Debtors and JPMC consented to the Court granting the Creditors' Committee "standing to pursue all claims and causes of action the Debtors may have or may be able to assert against the Agent or Lenders [including] any and all claims and causes of action that might be asserted against the Agent or Lenders under Chapter 5 of the Bankruptcy Code, if any" (the "*Lender Claims*"). Standing Stipulation at ¶ 2. No other party in interest sought or obtained such standing prior to the Lien Challenge Deadline to pursue any such claims or causes of action on behalf of the Debtors' estates against JPMC and the Lenders.

### E. MatlinPatterson Complaint and Claim Objection

14. On July 13, 2009 MatlinPatterson instituted an adversary proceeding object-ing to the claims and liens asserted by the Agent (the "*MatlinPatterson Proceeding*"). On the same date, MatlinPatterson also filed a claim objection (the "*MatlinPatterson Claim Objection*"), objecting to the Agent's and Lenders' claims and liens on the same bases as those asserted in the MatlinPatterson Proceeding. Given that the causes of action in the MatlinPatterson Proceeding were similar to those alleged in the Creditors' Committee's adversary proceeding against the Agent, MatlinPatterson the agreed to stay the MatlinPatterson Proceeding, provided that it could participate in the discovery taken in connection with the Adversary Proceeding. On September 16, 2009, the Court entered an order staying the MatlinPatterson Proceeding.

### F. The Proposed Settlement of Cash Collateral Issues

15. On August 5, 2009, the Debtors, the Agent and the Committee jointly filed their motion under 9019(a) seeking to resolve the Abandonment Motion and the Reconsideration Motion and to narrow the issues to be litigated before the Court (the "*9019 Motion*").

16. On August 19, 2009, the Court conducted a hearing on the 9019 Motion and expressed certain concerns with approval of the 9019 Motion. The parties took these concerns to heart and requested the Court continue the hearing to a future date in order to address the Court's concerns. Following the hearing, the parties have continued efforts to reach a consensual resolution of the pending objections to address the Court's concerns.

17. On October 26, 2009, the Court entered two separate orders denying the Abandonment Motion [Docket No. 1201]

and the Cash Collateral Reconsideration Motion [Docket No. 1202] for want of prosecution (collectively, the *"Dismissal Orders"*). On November 5, 2009, the Committee filed a motion to reconsider the Dismissal Orders (the *"Dismissal Reconsideration Motion"*).

### G. Creditors' Committee's Adversary Proceeding

18. After receiving document discovery, the Creditors' Committee determined and notified the Debtors and the Agent that it believed the Plan's underlying assumptions regarding value were incorrect. Additionally, the Creditors' Committee raised concerns about various provisions of the Plan. Ultimately, the Committee initiated litigation challenging the allocation of the Debtors' value in the Plan. On August 4, 2009, the Creditors' Committee filed its complaint (the *"Complaint"*) against the Agent commencing this Adversary Proceeding (the *"Adversary Proceeding"*). The Complaint sought the following relief:

"(i) to avoid and preserve for the benefit of the estates any liens on the Debtors nearly 1200 copyrights and any receivables generated by the copyrights, (ii) a declaration that the Agent does not have a lien on the Branding Agreement between the Debtors and Verizon and that the Branding Agreement is preserved for the benefit of the estates, or, alternatively, that the Agent's purported lien on the Branding Agreement is invalid and is avoided, (iii) a determination of the scope of the Agent's collateral, and (iv) a valuation of the Agent's collateral as of the Petition Date."

Complaint ¶ 6.

19. On August 5, 2009, the Creditors' Committee filed its Amended Complaint.

On September 4, 2009, the Agent filed an answer denying the material allegations in the Complaint [Adv. Docket No. 5]. On September 16, 2009, the Court entered an order permitting the Debtors to intervene in the Adversary Proceeding [Adv. Docket No. 15].

20. Following the commencement of the Adversary Proceeding, the parties engaged in an expedited discovery process involving the exchange of documents, answers to written interrogatories and requests for admission, more than 20 fact depositions, the exchange of expert reports, and the depositions of the five expert witnesses proposed by the Parties. While MatlinPatterson was not party to the Adversary Proceeding, it was permitted to, and did, participate in the discovery process. On November 2, 2009, each of the Creditors' Committee, the Agent and the Debtors filed under seal pre-trial briefs setting forth their arguments in the Adversary Proceeding.[2] A statement of each of the Parties' legal positions may be found in the pre-trial briefs and the trial transcripts, which are incorporated herein for the purposes of providing such a description.

21. Prior to the commencement of trial, the Creditors' Committee stipulated to the dismissal with prejudice of Count 3 of the Complaint seeking avoidance of the Agent's lien on the Verizon branding agreement. On November 9, 2009, the trial on the Adversary Proceeding commenced.

### H. Plan of Reorganization and Paulson Backstop

22. On September 10, 2009, this Court entered an order approving the Debtors' Disclosure Statement with Respect to the

---

**2.** These pleadings were filed under seal pursuant to the Court's order dated November 5, 2009, given the references in the pleadings to confidential, material non-public information.

First Amended Joint Plan of Reorganization of Idearc Inc., *et al.*, Debtors [Docket No. 941] (the *"Disclosure Statement"*), and on September 21, 2009, the Debtors began solicitation of their First Amended Joint Plan of Reorganization of Idearc Inc., *et al.*, Debtors [Docket No. 942] (the *"Plan"*). A detailed description of the Debtors' businesses and operations, including post-Petition Date activities, are set forth in the Disclosure Statement, which is incorporated herein by reference for purposes of background to the Motion.

23. The Plan currently provides that 95% of the New Common Stock[3] will be issued to the holders of Class 3 claims (Allowed Secured Credit Facility Claims) and 5% of the New Common Stock will be issued to Class 4 claims (Allowed Unsecured Note Claims, Allowed Unsecured Credit Facility Claims and Allowed General Unsecured Claims).

24. While neither the Committee nor MatlinPatterson have interposed objections to the Plan to date, they have shared certain concerns with both the Debtors and the Agent. The deadline for the Committee and MatlinPatterson to file an objection has been extended by agreement.

25. Paulson & Co. Inc. as manager of various investment funds and accounts (collectively, *"Paulson"*), has agreed to acquire shares of the New Common Stock to be issued under the Plan, thereby providing a liquidity option under the Plan for creditors entitled to receive such stock. Pursuant to the agreement between the Debtors and Paulson (the *"Paulson Backstop"*), creditors may elect, in their sole discretion, to receive cash rather than New Common Stock. On November 18, 2009, the Court approved the Paulson Backstop.

**3.** Unless otherwise defined in the Motion, capitalized terms herein have the meanings

## V. *DESCRIPTION OF COMPROMISE AND SETTLEMENT*

26. The Parties believe, based on the issues that have been briefed to the Court and their independent analysis, that there are substantial risks in continued litigation regarding the claims and causes of action set forth in the Complaint, including the risk of delay regarding the confirmation of the Plan. Accordingly, the Parties, in order to avoid such risks and delays, have negotiated the agreement memorialized herein (the *"Settlement"*).

27. The principal terms of the Settlement are as follows:

(a) The Credit Facility Claims shall be allowed as of the Petition Date in the amount of $7.03 billion, and for purposes of the Plan, shall be allowed as Class 3 secured claims in the amount of $4 billion ($3.75 billion after giving effect to the $250 million adequate protection payment made pursuant to the Cash Collateral Order), with the remainder of the Credit Facility Claims, with a face value of approximately $3.03 billion (the *"Deficiency Claim"*) allowed as Class 4 claims; and

(b) The Unsecured Note Claims will be allowed as Class 4 claims in the aggregate amount of $2,936,133,333.33.

(c) The Lenders shall waive their entitlement to distributions on account of the Deficiency Claim, to the extent set forth herein.

(d) The Plan will be modified as follows:

i. Section 3.3(b) of the Plan, governing the treatment of Class 4 Claim Holders, will be amended to provide that holders of Unsecured Note Claims will be placed in Sub–Class 1. Members of Sub–Class 1 will receive their pro rata share of:

set forth in the Plan.

(1) $120 million in cash; and

(2) Shares of the New Common Stock representing 15% of the shares of the New Common Stock to be issued and outstanding on the Effective Date.

ii. Section 3.3(b) of the Plan will be further amended to provide that holders of General Unsecured Claims, which are defined in the Plan as unsecured claims that are not Credit Facility Claims or Unsecured Noteholder Claims, will be placed in Sub–Class 2. Members of Sub–Class 2 will receive a cash payment (the "*Sub–Class 2 Payment*") equal to the lesser of:

(1) 25% of the face value of such holders' claims, or

(2) Such holder's pro rata share of $3 million ($3,000,000).

iii. Members of Sub–Class 2 may elect to receive the same treatment as members of Sub–Class 1; provided that if such Sub–Class 2 Member so elects, such member's pro rata Sub–Class 2 Payment will be distributed pro rata to members of Sub–Class 1.

(1) Such election will be made at the same time holders of unsecured claims select their treatment pursuant to the Paulson Backstop.

iv. Section 5.12 of the Plan will be amended to provide that "As soon as practicable after the Effective Date, the Reorganized Debtors will set aside $2.5 million in a litigation expense account to pay the costs and expenses for prosecuting Litigation Trust Rights in the Litigation Trust in accordance with the Plan."

v. The first $30 million in proceeds from the Litigation Trust (the "*Litigation Trust Proceeds*") will be distributed to holders of claims in Sub–Class 1. Thereafter, Litigation Trust Proceeds will be distributed pro rata on account of all Class 4

Claims, including Unsecured Note Claims, General Unsecured Claims and the Deficiency Claim.

(e) Upon the Effective Date, pursuant to the Plan, each of the Debtors, the Agent and the Creditors' Committee (and its members) agree that the Debtors, the Reorganized Debtors and any party seeking to enforce the rights of the Debtors' Estates will release, waive, and discharge all claims, obligation, suits, judgments, damages, demands, and causes of action (including claims or causes of action arising under chapter 5 of the Bankruptcy Code or any similar state law, including without limitation, any fraudulent transfer or other claims arising out of the spinoff of Idearc from Verizon) related to the Debtors, the Chapter 11 Case or the Plan against each of the Debtors, the Agent, the Lenders, the Indenture Trustee, the holders of the Debtors' unsecured notes, and each of the foregoing's professionals and advisors. Consistent with the Final Cash Collateral Order, claims against Verizon are not released and Verizon is not included as a "Lender" for purposes of this Motion and Settlement. Nothing herein shall release the right of any releasing party to receive distributions under the Plan and nothing shall release the charging lien of the Indenture Trustee.

(f) The Creditors' Committee and MatlinPatterson agree not to file or otherwise raise any objections to the Plan.

(g) The Creditors' Committee agrees to support, and the Debtors and the Agent agree not to object to any claim for substantial contribution brought by MatlinPatterson, provided such claim does not exceed $3 million.

(h) Upon the Effective Date, each of (i) the Adversary Proceeding, (ii) the MatlinPatterson Proceeding, (iii) the MatlinPatterson Claim Objection, (iv) the Dismissal Reconsideration Motion and (v) the Matlin-

Patterson Reconsideration Motion will be deemed withdrawn and dismissed with prejudice, and the Creditors' Committee and MatlinPatterson, as applicable, will agree to take any action necessary to effect such withdrawal and/or dismissal.

(i) Approval of the Settlement will be a condition precedent to confirmation of the Plan.

(j) In the event that the Court denies approval of the Settlement, or the Plan, as modified to reflect the terms of the Settlement is not confirmed or does not become effective, the Parties' agreement will terminate and be void, all of the statements, admissions, consents and agreements contained in or made in connection with this Motion shall be void; and neither the Creditors' Committee, the Debtors, MatlinPatterson nor the Agent may use or rely on any such statement, admission, consent or agreement in any public statement or litigation involving the Parties.

## VI. *BASIS FOR RELIEF REQUESTED*

### A. *Standards for Approving Settlement*

28. "One of the goals of Congress in fashioning the Bankruptcy Code was to encourage parties in a distress situation to work out a deal among themselves." *In re Mirant Corp.*, 334 B.R. 800, 811 (Bankr.N.D.Tex.2005). "Compromises are favored in bankruptcy" because they minimize litigation costs and further the parties' interest in expediting the administration of a bankruptcy case. *In re Martin*, 91 F.3d 389, 393 (3d Cir.1996) (quoting 9 *Collier on Bankruptcy* ¶ 9019.03[1] (15th ed. Rev.1993)).

29. Bankruptcy Rule 9019(a) provides, in pertinent part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr.P. 9019(a); 11

U.S.C. § 1107. Bankruptcy Rule 9019(a) empowers a bankruptcy court to approve compromises and settlements if they are " 'fair and equitable and in the best interest of the estate.' " *In re Cajun Elec. Power Coop., Inc.*, 119 F.3d 349, 355 (5th Cir.1997).

30. A decision to accept or to reject a compromise or settlement is within the sound discretion of the Court. *See* 9 *Collier on Bankruptcy* at ¶ 9019.02. The settlement need not result in the best possible outcome for the debtor, but must not " 'fall beneath the lowest point in the range of reasonableness.' " *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 499, 505 (Bankr.S.D.N.Y.1991) (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir.1983)). Essential to the process of evaluating proposed settlements, then, "is the need to compare the terms of the compromise with the likely rewards of litigation." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 425, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968).

31. To determine whether a settlement is fair and equitable, this Court should consider and evaluate the following factors: (i) the probability of success in the litigation, with due consideration for uncertainty in fact and law; (ii) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; and (iii) all other factors bearing on the wisdom of the compromise. *See Cajun Electric*, 119 F.3d at 356 (citations omitted). While a court must "evaluate ... all ... factors relevant to a fair and full assessment of the wisdom of the proposed compromise," *Anderson*, 390 U.S. at 424–25, 88 S.Ct. 1157, a court need not conduct a "mini-trial" of the merits of the claims being settled, *W.T. Grant Co.*, 699 F.2d at 608, or conduct a full independent investigation. *Drexel Burnham Lambert Group,*

134 B.R. at 496. "[T]he bankruptcy judge does not have to decide the numerous questions of law and fact. . . . The court need only canvass the settlement to determine whether it is within the accepted range of reasonableness." *Nellis v. Shugrue,* 165 B.R. 115, 123 (S.D.N.Y.1994).

32. The court may give weight to the "informed judgments of the . . . debtor-in-possession and their counsel that a compromise is fair and equitable, and consider the competency and experience of counsel who support the compromise." *Drexel Burnham Lambert Group,* 134 B.R. at 505 (internal citations omitted); *see also In re Ashford Hotels Ltd.,* 226 B.R. 797, 802 (Bankr.S.D.N.Y.1998) ("Significantly, that test does not contemplate that I substitute my judgment for the Trustee's, but only that I test his choice for reasonableness").

33. The Debtors, the Creditors' Committee, and the Agent each have concluded that the Settlement provides the best framework to facilitate the Debtors' timely emergence from bankruptcy protection. Given that the Settlement resolves both the hotly contested dispute between the Agent and the Creditors' Committee and potential disputes between the Debtors and each of the Creditors' Committee and MatlinPatterson regarding the Plan, the Parties further submit that the settlement is reasonable. Moreover, each of the *Cajun Electric* factors militates in favor of settlement.

### 1. There Is Significant Risk In Continuing The Adversary Proceeding And Related Disputes Over The Plan

34. The Creditors' Committee commenced the Adversary Proceeding in order to resolve complex threshold questions of fact and law regarding the allocation of the value of the Debtors' unencumbered assets to holders of unsecured claims. In the Adversary Proceeding, the Creditors' Committee contested both the Debtors' and the Agent's assessment that the Agent held liens, for the benefit of the Lenders, on substantially all of the Debtors' assets, as well as the Debtors' and the Agent's valuation of certain unencumbered assets. Further, the Creditors' Committee challenged the extent and priority of the Agent's security interests on property acquired by the Debtors post-petition. These questions bear directly on confirmation of the Plan, and as such were in the process of being litigated and resolved by the Court prior to the confirmation hearing.

35. The Adversary Proceeding involved, *inter alia,* complicated questions of valuation. The Creditors' Committee contends that the Debtors unencumbered assets, including the Debtors' copyrights, have significant value and that such value should be distributed to holders of unsecured claims. The Agent contends that the Debtors' unencumbered assets have *de minimis* value. Resolution of the question of the value of the Debtors' unencumbered assets involves consideration of an important legal question regarding the appropriate mechanism for perfection of rights in revenues received pursuant to certain advertising contracts, which revenues the Creditors' Committee contended were appurtenant to copyrights and needed to be perfected by filing in the U.S. Copyright Office.[4] Once the threshold le-

---

4. The Creditors' Committee's Amended Complaint also challenged the Agent's liens on the Debtors;' rights to the Verizon brand. The Creditors' Committee stipulated to dismiss

gal question regarding perfection was resolved, the Court would need to value the unencumbered assets, whatever those may be. Depending on that determination, the Debtors' potentially might need to delay confirmation of their plan in order to address the Court's rulings.

36. In addition to the resolution of the value of the Debtors' pre-petition unencumbered assets, the Creditors' Committee contends that revenue attributable to (i) contracts executed post-petition and (ii) contracts relating to books published post-petition are unencumbered, not proceeds of the Agent's collateral, and therefore the value of such revenue streams should be allocated to unsecured creditors. The Creditors' Committee further contends that there has been no compensable diminution in the value of the Agent's collateral, and therefore, the Agent's replacement liens do not attach to the post-petition revenue streams.

37. The Agent contends that the Debtors' registered copyrights have *de minimis* value. The Agent also contends that any post-petition revenue streams are (i) encumbered by the Agent's pre-petition lien on general intangibles, including goodwill, (ii) proceeds of the Agents' pre-petition collateral and, in any event, (iii) subject to the Agent's Replacement Liens as a result of the significant diminution in the value of the Debtors' estates since the commencement of the Debtors' Chapter 11 cases.

38. The application of section 552 of the Bankruptcy Code in the unique circumstances of this case is an important element of this latter dispute. Section 552 has not been interpreted by many courts,

and therefore there is little precedent for its application under the facts of this case, such that novel legal issues must be decided, including the application of section 552(a) to revenue streams attributable to a debtor's post-petition efforts.

39. Even assuming that the Committee was successful on its challenges with respect to the application of section 552, the Agent contends that little value would be attributable to unsecured creditors because of the significant diminution in the value of the Agent's collateral. The Creditors' Committee contends that any diminution would not be compensable under the Bankruptcy Code. This issue, too, would need to be resolved prior to confirmation of the Plan.

40. Beyond the issues in the Adversary Proceeding, the Committee and MatlinPatterson had expressed concern about the confirmability of the Plan. Absent a global compromise, such as the Settlement, the Committee and MatlinPatterson likely would have argued that the new secured debt being issued to holders of Class 3 Claims under the Plan is prohibitively large, not market and must be reduced in order for the Debtors to remain viable following the confirmation of the Plan. The Committee also likely would have argued that other infirmities in the Plan militate against confirmation of the Plan as drafted. The Debtors and the Agent would certainly strongly contest the Creditors' Committee's allegations, arguing that the Debtors' post-petition cash flows would easily service the Debtors' post-emergence debt for the next five years. The Debtors would also have likely contested each of the Committee's technical confirmation objections.

this count with prejudice shortly before the commencement of the trial of the Adversary

41. There is a broad range of possible outcomes attendant to the resolution of the complex factual and legal issues raised above. Assuming, for example, that the Debtors' valuation in the Disclosure Statement is correct, the equity distributed to unsecured creditors (excluding the Lenders' deficiency claim) under the Plan would have been worth approximately $6.5 million (based on the equity valuation for the Debtors implied by the Paulson Backstop). After providing for the Deficiency Claim, all non-Lender unsecured creditors would have received less than $0.01 per dollar on account of their unsecured claims. Thus, if the Agent were to prevail in the Adversary Proceeding, the nearly $3 billion of non-Bank unsecured creditors would have received a *de minimis* recovery account of their claims.

42. If the Committee were to prevail on its claims in the Adversary Proceeding, the unsecured creditors would have been entitled to significantly greater recoveries than currently provided for in the Plan. If the Committee were successful on its section 552 claims unsecured creditors, subject to the Agent's adequate protection arguments and the Deficiency Claim, could have been entitled to hundreds of millions of dollars. In comparison, the aggregate value of the Settlement to unsecured creditors (excluding the Lenders' unsecured deficiency claim) is estimated to be approximately $160 million, which is certainly well within the range of possible outcomes in the litigation. In addition, the Settlement resolves the Creditors' Committee's and MatlinPatterson's potential objections to confirmation of the Plan, and paves the way for a smooth confirmation process and the expedited emergence of the Debtors from Chapter 11.

43. Moreover, the Settlement provides enhanced treatment to holders of General Unsecured Claims other than bondholders. Under the Plan, General Unsecured Claims are currently treated *pro rata* with both the Unsecured Noteholder Claims and the Unsecured Credit Facility Claims. Given the magnitude of these claims, General Unsecured Claims would receive next to nothing. However, under the Settlement, the non-bank, non-bond General Unsecured Creditors will be moved into a sub-class and will receive up to 25% of the face value of their claims. This is far greater than the recovery offered to the other unsecured claim holders.

44. In addition to the preservation and distribution of significant recoveries to holders of unsecured claims, the Settlement paves the way for the Debtors' prompt emergence from bankruptcy protection. Judicial resolution of the significant issues raised in the Adversary Proceeding could have jeopardized the Debtors' smooth exit from chapter 11. Indeed, if the Creditors' Committee was successful, the Plan likely would have been discarded in order to permit the parties to negotiate a new plan based on the Court's rulings. New negotiations would likely have resulted in significant delay in the Debtors' emergence. Moreover, even if the Agent were successful in the Adversary Proceeding, the Committee would have challenged the confirmability of the Plan, which could have injected even further uncertainty and delay into the Debtors' reorganization cases.

45. In light of the foregoing, the Creditors' Committee, the Debtors, the Agent, and MatlinPatterson believe that they have sound business justification for entering into the Settlement set forth above and that the Settlement serves the interest of the Debtors' estates. The delay and expense that would result from appeals, regardless of the outcome of the Adversary

Proceeding, further counsels in favor of settlement.

### 2. The Settlement Alleviates Significant Delay And Attendant Expense

46. From the description of the complex factual and legal issues noted above, it is clear that the prospect of protracted litigation if the Settlement were not approved is significant. While the Parties have briefed the issues in the Adversary Proceeding, and the trial regarding the determination of certain of those issues had commenced and was underway, it is readily apparent that regardless of the outcome of this Court's decision, the likelihood that these issues will be heard on appeals to the District Court and Circuit Court of Appeals is also significant. If the Settlement were not approved, the Debtors' estates and the Agent would be faced with prolonged and expensive appellate litigation. Moreover, as noted above, the resolution of the issues in the Adversary Proceeding bears directly on the Plan. Thus, the delays of protracted litigation between the Agent and the Creditors' Committee could have delayed confirmation of the Plan and the emergence of the Debtors from these Chapter 11 cases.

### 3. The Settlement Is In The Best Interests Of The Estate And All Its Constituencies

47. After extensive participation at every stage of the negotiations and proceedings to date, the Creditors' Committee, which represents all the unsecured creditors of the Debtors' estates, unanimously approved the Settlement. Additionally, MatlinPatterson, the largest bondholder, has approved the settlement. JPMorgan, as Agent to the Lenders, has also approved the Settlement after consultation with (and receiving the approval of) a steering committee of Lenders. The Agent's support for the Settlement was not only vital to reaching the Settlement, but necessary given its asserted liens on substantially all of the Debtors' assets. Finally, Debtors, through the Idearc Inc. Board of Directors, have approved the Settlement.

48. In a case such as this where none of the creditors will be repaid in full, the Settlement represents an opportunity for all creditors to realize value that otherwise may not have been possible. Indeed, absent the Settlement, the General Unsecured Creditors would have shared pro rata with both the Deficiency Claim and the Unsecured Noteholder Claims. Pursuant to the Settlement, General Unsecured Claims will receive up to 25% of the face amount of their claims, which is a significantly higher recovery than they would have otherwise received.

49. The Settlement also eliminates the need for the Creditors' Committee, Debtors, the Agent, and MatlinPatterson to continue expending estate resources litigating over complex issues. Indeed, such litigation could continue to be costly, and may serve to lengthen the time the Debtors remain in chapter 11. If approved, the Settlement will permit the Parties to focus their efforts on assisting the Debtors in promptly emerging from chapter 11 and maximizing their value for all constituencies. Therefore, it is the position of the Debtors, the Agent, the Creditors' Committee, and MatlinPatterson that, based on careful evaluation, this Settlement is in the best interest of the Debtors' bankruptcy estates.

### VII. CONCLUSION

WHEREFORE, for the reasons set forth in this Motion, the Parties respectfully request that this Court: (a) enter an

order approving the Settlement; and (b) grant such other relief as the Court may deem just and proper.

### Exhibit 2

### (Sean Ryan Settlement Motion)

### [Docket No. 1635]

### JOINT MOTION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS PURSUANT TO SECTIONS 105(a), 1128 AND 1129 OF THE BANKRUPTCY CODE AND FED. R. BANKR. P. 9019(a), FOR AN ORDER APPROVING STIPULATION AND SETTLEMENT AGREEMENT REGARDING (I) AMOUNT AND ALLOWANCE OF SEAN RYAN'S CLAIM, (II) WITHDRAWAL OF MOTIONS, OBJECTIONS AND OTHER PLEADINGS FILED BY SEAN RYAN, AND (III) DISMISSAL OF ADVERSARY PROCEEDING INITIATED BY SEAN RYAN

The debtors and debtors in possession (the "*Debtors*") and the Official Committee of Unsecured Creditors (the "*Committee*") in the above-captioned cases hereby file this joint motion (the "*Motion*") for an order approving the stipulation and settlement agreement (the "*Stipulation*")[1] entered into by and among the Debtors, the Committee, JPMorgan Chase Bank, N.A., as the administrative agent (the "*Administrative Agent*") to the Lenders,[2] and Sean Ryan ("*Ryan*"; collectively, the "*Parties*"). In support of the Motion, the Debtors and the Committee respectfully state as follows:

1. A true and correct copy of the proposed Stipulation is attached hereto as Exhibit A.

## I. PRELIMINARY STATEMENT

1. Ryan is a creditor of the Debtors that has asserted certain prepetition tort claims against the Debtors that are the subject of a prepetition civil action pending in the California Superior Court, currently on appeal. Ryan, through his counsel, has been actively involved in all stages of these chapter 11 cases, including, without limitation, the negotiation and development of the treatment afforded to holders of non-bank/non-bond general unsecured claims against the Debtors under the Debtors' proposed joint chapter 11 plan of reorganization [Docket No. 1392] (the "Plan"). In addition, Ryan has filed numerous pleadings in these cases, including objections to the disclosure statement for the Plan and to the confirmation of the Plan, and initiated an adversary proceeding by filing a complaint naming Verizon, the Administrative Agent and certain individuals as defendants (the "*Ryan Adversary Proceeding*").

2. The Parties have engaged in discussions regarding a consensual resolution of various issues raised by Ryan with respect to the Plan, the prepetition actions between Ryan and the Debtors, the Ryan Adversary Proceeding and Ryan's claims asserted against the Debtors generally. Based on these negotiations, the Parties have reached a settlement of the issues set forth in the Stipulation attached hereto as Exhibit A. By this Motion, the Debtors and the Committee jointly seek approval of the Stipulation which provides, in pertinent part, as follows:

 a. Ryan will withdraw the Ryan Complaint (defined below) and will cause the dismissal of the Ryan Adversary Proceeding.

2. Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Plan (as defined below).

b. Ryan will withdraw each of the pleadings he has filed in these cases, including, without limitation, Ryan's objection to confirmation of the Plan.

c. Subject to certain procedures, Ryan will dismiss with prejudice all claims in the Prepetition Actions (defined below) against the debtors, the Reorganized Debtors and the Estates (but not against Verizon).

d. Except for the Allowed Ryan Claim (defined below) and a Substantial Contribution Claim (subject to certain limitations), Ryan will not assert any claims against the Debtors, the Estates, the Administrative Agent, the Lenders, the members and professionals of the Committee, the Indenture Trustee and the Holders of Unsecured Note Claims or any other persons specified in Section 10.8(c) of the Plan; provided that nothing contained in the Stipulation will waive or release the Allowed Ryan Claim against the Debtors or the Estates.

e. Ryan will agree to be bound by the release, waiver and discharge set forth in Section 10.8(c) of the Plan.

f. The Debtors, the Reorganized Debtors and the Estates will release and discharge Ryan from any and all claims, demands or causes of actions arising through and including the date of the Stipulation.

g. Ryan will have a single, Allowed Class 4 General Unsecured Claim in the amount of $1,437,530.03 (the "Allowed Ryan Claim"), which allowed claim Ryan will not amend or modify.

h. On account of the Allowed Ryan Claim, Ryan shall be entitled to his share of the distributions under Subclass 2 of Class 4 of the Plan.

i. The Debtors, the Committee and the Administrative Agent will agree not to object to any motion or application by Ryan and/or his counsel for payment of a Substantial Contribution Claim of no more than $400,000 in the aggregate for any costs and expenses incurred by Ryan and/or his counsel during these chapter 11 cases.

j. Upon the effective date of the Plan, the automatic stay will be terminated on a limited basis to allow Ryan to proceed with the prosecution of the Prepetition Actions (defined below) for any claims or causes of action that Ryan may have against Verizon, subject to the defenses, if any, of Verizon; provided that Ryan shall not prosecute any claims or causes of action against Verizon that belong to the Debtors, the Reorganized Debtors, the Estates and/or are transferred to the Litigation Trust.

3. As set forth in greater detail below, the Debtors and the Committee believe the settlement with Ryan removes one of the last remaining obstacles to a consensual confirmation of the Plan and the Debtors' timely emergence from these chapter 11 cases. In addition, the Stipulation will permit the estates to avoid the delays and significant costs and expenses attendant with continued, protracted litigation with Ryan as well as any appeals. Accordingly, the Debtors and the Committee submit that the Stipulation is in the best interests of the Debtors' estates and creditors.

## II. *JURISDICTION AND VENUE*

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This

matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The statutory predicates for relief are sections 105(a), 1128 and 1129 of title 11 of the United States Code (the *"Bankruptcy Code"*) and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the *"Bankruptcy Rules"*).

### III. *BACKGROUND FACTS*

5. On March 31, 2009, Idearc Inc. and nine of its affiliates each filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the *"Petition Date"*). The cases of each of the Debtors being jointly administered with that of Idearc Inc.

6. On April 14, 2009, the United States Trustee appointed the Committee, which appointment was subsequently amended. No other official committees have been appointed or designated in these chapter 11 cases.

7. Prior to the Petition Date, Ryan, as plaintiff, and Debtor Idearc Media Sales— West Inc. (*"Idearc Media Sales"*), as defendant, were parties to that certain civil action titled *Sean Ryan v. Verizon Directories Sales—West, Inc., a Delaware Corporation, and Does 1 through 50* pending as Case No. GIN 054512 in the Superior Court of the State of California, County of San Diego—North County Judicial District (the *"Prepetition Civil Action"*). Following the state court's entry of a judgment in the Prepetition Civil Action in favor of Ryan on certain causes of action and in favor of Idearc Media Sales on others, both Ryan and Idearc Media Sales filed appeals with the California Court of Appeal, docketed as Appeal Nos. D053060 and D054166 (collectively, the *"Prepetition Appeal"*; together with the Prepetition

Civil Action, the *"Prepetition Actions"*). As a result of the Debtors' bankruptcy filing, the Prepetition Appeal automatically has been stayed and the Prepetition Actions remain unresolved.

8. On or about August 10, 2009, Ryan filed two separate proofs of claim against Idearc Inc. on account of his claims asserted in the Prepetition Actions, each in the amount of $1,437,530.03 (the *"Ryan Claims"*), which were docketed as claim numbers 1717 and 1951 on the claims register. True and correct copies of the Ryan Claims are attached hereto as Exhibit A.

9. On July 13, 2009, Ryan filed a complaint (the *"Ryan Complaint"*) in the Bankruptcy Court naming Verizon Communications, Inc., certain individuals, and the Administrative Agent as defendants and initiated the adversary proceeding titled *Ryan v. Verizon Communications, Inc., et al.,* Case No. 09–03219(BJH) (the *"Ryan Adversary Proceeding"*).

10. In addition to the Ryan Complaint, Ryan has filed various other motions, objections, and other pleadings (together with the Ryan Complaint, the *"Ryan Pleadings"*) during the course of these chapter 11 cases, including, without limitation, an objection to confirmation of the Plan [Docket No. 1343] (the *"Ryan Confirmation Objection"*).[3] A non-exclusive list of the Ryan Pleadings is attached to the proposed Stipulation as Exhibit B.

### IV. *RELIEF REQUESTED*

11. By this Motion, the Debtors and the Committee jointly request that the Court enter an order, pursuant to section 105(a) of the Bankruptcy Code and Rule 9019(a) of the Bankruptcy Rules, approving the Stipulation.

---

**3.** The Prepetition Actions, the Ryan Claims, the Ryan Adversary Proceeding and the Ryan Pleadings are collectively referred to as the *"Ryan Matters."*

## V. BASIS FOR RELIEF REQUESTED

### A. Standards for Approving Settlement

12. "One of the goals of Congress in fashioning the Bankruptcy Code was to encourage parties in a distress situation to work out a deal among themselves." *In re Mirant Corp.*, 334 B.R. 800, 811 (Bankr.N.D.Tex.2005). "Compromises are favored in bankruptcy" because they minimize litigation costs and further the parties' interest in expediting the administration of a bankruptcy case. *In re Martin*, 91 F.3d 389, 393 (3d Cir.1996) (quoting 9 *Collier on Bankruptcy* ¶ 9019.03m (15th ed. Rev.1993)).

13. Bankruptcy Rule 9019(a) provides, in pertinent part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr.P. 9019(a); 11 U.S.C. § 1107. Bankruptcy Rule 9019(a) empowers a bankruptcy court to approve compromises and settlements if they are " 'fair and equitable and in the best interest of the estate.' " *In re Cajun Elec. Power Coop., Inc.*, 119 F.3d 349, 355 (5th Cir.1997).

14. A decision to accept or to reject a compromise or settlement is within the sound discretion of the Court. *See* 9 *Collier on Bankruptcy* at ¶ 9019.02. The settlement need not result in the best possible outcome for the debtor, but must not " 'fall beneath the lowest point in the range of reasonableness.' " *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 499, 505 (Bankr.S.D.N.Y.1991) (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir.1983)). Essential to the process of evaluating proposed settlements, then, "is the need to compare the terms of the compromise with the likely rewards of litigation." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 425, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968).

15. To determine whether a settlement is fair and equitable, this Court should consider and evaluate the following factors: (i) the probability of success in the litigation, with due consideration for uncertainty in fact and law; (ii) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; and (iii) all other factors bearing on the wisdom of the compromise. *See Cajun Electric*, 119 F.3d at 356 (citations omitted). While a court must "evaluate . . . all . . . factors relevant to a fair and full assessment of the wisdom of the proposed compromise," *Anderson*, 390 U.S. at 424–25, 88 S.Ct. 1157, a court need not conduct a "mini-trial" of the merits of the claims being settled, *W.T. Grant Co.*, 699 F.2d at 608, or conduct a full independent investigation. *Drexel Burnham Lambert Group*, 134 B.R. at 496. "[T]he bankruptcy judge does not have to decide the numerous questions of law and fact. . . . The court need only canvass the settlement to determine whether it is within the accepted range of reasonableness." *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y.1994).

16. The court may give weight to the "informed judgments of the . . . debtor-in-possession and their counsel that a compromise is fair and equitable, and consider the competency and experience of counsel who support the compromise." *Drexel Burnham Lambert Group*, 134 B.R. at 505 (internal citations omitted); *see also In re Ashford Hotels Ltd.*, 226 B.R. 797, 802 (Bankr.S.D.N.Y.1998) ("Significantly, that test does not contemplate that I substitute

my judgment for the Trustee's, but only that I test his choice for reasonableness").

17. The Debtors and the Committee each have concluded that the settlement with Ryan permits the Debtors to move forward with the confirmation of the Plan and emerge timely from these chapter 11 cases. In addition, the Debtors and the Committee believe that the Stipulation satisfies each of the *Cajun Electric* factors.

18. Indeed, the Stipulation will resolve one of the few remaining substantive objections to confirmation of the Plan. While the Debtors and the Committee remain confident that the Ryan Confirmation Objection eventually would be overcome, there always remains an inherent uncertainty in the resolution of confirmation objections and the time delays associated with litigation.

19. Furthermore, the impact of the outcome of the Ryan Adversary Proceeding on Plan confirmation remains unclear. As filed, the Ryan Adversary Proceeding constitutes a formal objection to the claims of the Administrative Agent and the Lenders, and includes a demand that the Lenders' secured claims be subordinated to the claims of Ryan. While the Administrative Agent remains confident that the validity and priority of the claims of the Administrative Agent and the Lenders would have been upheld in the Ryan Adversary Proceeding, the Ryan Adversary Proceeding potentially is intertwined with Plan confirmation and could impact the Plan's proposed distributions.

20. Likewise, absent the Stipulation, the ultimate outcome of the Prepetition Actions, including the Prepetition Appeal, and the final resolution, and particularly the magnitude, of the Ryan Claims remain unknown.

21. In addition to the inherent uncertainties in the outcome of the Ryan Matters, the continued litigation of those actions and claims would impose a significant burden on the Debtors and the estates, both in terms of time and costs. As evident from the level of Mr. Ryan's involvement in these cases, the prospect of continued, protracted litigation with respect to the Ryan Matters is real. Even if some or all of the Ryan Matters are resolved by this Court, the likelihood of appeals remains significant. Thus, absent the Stipulation, the Parties would continue with prolonged litigation that potentially could delay confirmation of the Plan to the detriment of all the estates' creditors.

22. The Stipulation also eliminates the need for the Debtors, the Committee, and the Administrative Agent to continue expending estate resources litigating the Ryan Matters. Indeed, such litigation could continue to be costly. By approving the Stipulation, the Court will permit the Parties to focus their efforts on assisting the Debtors in promptly emerging from chapter 11 and maximizing their value for all constituencies.

23. In light of the foregoing, the Debtors and the Committee submit that the Stipulation is fair and equitable and in the best interests of the estates.

*[The remainder of this page intentionally left blank.]*

## VI. *CONCLUSION*

WHEREFORE, for the reasons set forth in this Motion, the Debtors and the Committee respectfully request that this Court: (a) enter an order approving the Stipulation; and (b) grant such other relief as the Court may deem just and proper.

Dated: December 1, 2009

## EXHIBIT "A"

*STIPULATION BY AND AMONG THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, THE ADMINISTRATIVE AGENT TO THE PREPETITION SECURED LENDERS AND SEAN RYAN REGARDING (I) AMOUNT AND ALLOWANCE OF CLAIM, (II) WITHDRAWAL OF MOTIONS, OBJECTIONS AND OTHER PLEADINGS, AND (III) DISMISSAL OF ADVERSARY PROCEEDING; AND ORDER THEREON*

This stipulation and settlement agreement (the "Stipulation") is entered into by and among the above-captioned debtors and debtors in possession (the "Debtors"), the Official Committee of Unsecured Creditors (the "Committee"), JPMorgan Chase Bank, N.A., as the administrative agent (the "Administrative Agent") to the Lenders,[1] and Sean Ryan (including his heirs, agents and attorneys, "Ryan"; collectively, the "Parties") with respect to the following facts and recitals:

A. On March 31, 2009, the Debtors filed their voluntary petitions for chapter 11 relief (the "Petition Date").

B. On September 8, 2009, the Debtors filed their First Amended Joint Plan of Reorganization of Idearc Inc., *et al.*, Debtors [Docket No. 915]. On November 19, 2009, the Debtors filed a modified form of the first amended plan which incorporated certain terms of a global settlement reached among the Debtors, the Committee, the Administrative Agent, MatlinPatterson Global Opportunities Partners III LP and MatlinPatterson Global Opportunities Partners (Cayman) III LP [Docket No. 1392] (as modified, the "Plan").

C. Prior to the Petition Date, Ryan, as plaintiff, and Debtor Idearc Media Sales—West Inc. ("Idearc Media Sales"), as defendant, were parties to that certain civil action titled *Sean Ryan v. Verizon Directories Sales—West, Inc., a Delaware Corporation, and Does 1 through 50* pending as Case No. GIN 054512 in the Superior Court of the State of California, County of San Diego—North County Judicial District (the "Prepetition Civil Action"). Following the state court's entry of a judgment in the Prepetition Civil Action in favor of Ryan on certain causes of action and in favor of Idearc Media Sales on others, both Ryan and Idearc Media Sales filed appeals with the California Court of Appeal, docketed as Appeal Nos. D053060 and D054166 (collectively, the "Prepetition Appeal"; together with the Prepetition Civil Action, the "Prepetition Actions"). As a result of the Debtors' bankruptcy filing, the Prepetition Appeal automatically has been stayed and the Prepetition Actions remain unresolved.

D. On or about August 10, 2009, Ryan filed two separate proofs of claim against Idearc Inc. on account of his claims asserted in the Prepetition Actions, each in the amount of $1,437,530.03 (the "Ryan Claims"), which were docketed as claim numbers 1717 and 1951 on the claims register. As of the date of this Stipulation, Ryan has not assigned or transferred the Ryan Claims. True and correct copies of the Ryan Claims are attached hereto as Exhibit A.

E. On July 13, 2009, Ryan filed a complaint (the "Ryan Complaint") in the Bankruptcy Court naming Verizon Communications, Inc. ("Verizon"), certain individuals, and the Administrative Agent as defendants and initiated the adversary proceed-

---

1. Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Plan (defined below).

ing titled *Ryan v. Verizon Communications, Inc., et al.,* Case No. 09–03219(BJH) (the "Ryan Adversary Proceeding").

F. In addition to the Ryan Complaint, Ryan has filed various other motions, objections, and other pleadings (together with the Ryan Complaint, the "Ryan Pleadings") during the course of the Chapter 11 Cases, including, without limitation, an objection to confirmation of the Plan [Docket No. 1343] (the "Ryan Confirmation Objection").

G. The Parties have been engaged in discussions regarding a consensual resolution of various issues relating to the Plan, the Prepetition Actions, the Ryan Adversary Proceeding, the Ryan Pleadings and the Ryan Claims. Based on those discussions, the Parties have reached a settlement of those issues as more specifically set forth below.

NOW THEREFORE, in consideration of the foregoing, the Parties hereby stipulate and agree as follows:

1. Except as set forth below in paragraph 10, the recitals and agreements set forth herein shall not become effective or binding and shall not have any precedential effect until such time that the Bankruptcy Court enters, and are conditioned upon the Bankruptcy Court's entry of, (i) an order approving this Stipulation and (ii) an order confirming the Plan.

2. Ryan shall withdraw the Ryan Complaint and promptly shall cause the dismissal of the Ryan Adversary Proceeding. This dismissal shall be with prejudice as to JPMorgan Chase Bank, N.A. and as to any defendant that is a past or present officer or employee of an Idearc entity, and without prejudice as to any other defendant, specifically including Verizon.

3. Ryan shall withdraw each of the Ryan Pleadings specified on Exhibit B attached hereto, including, without limitation, the Ryan Confirmation Objection. This withdrawal shall be with prejudice as to the Debtors, the Reorganized Debtors, the Estates, the Administrative Agent, the Committee and each of the foregoing entity's advisors and professionals, but without prejudice as to Verizon. As hereinafter described, Ryan shall dismiss with prejudice all claims in the Prepetition Actions against the Debtors, the Reorganized Debtors and the Estates (but not against Verizon). Such withdrawal and dismissal shall not inure to the benefit of Verizon, nor does Ryan by entering into this Stipulation consent to the "transfer of the burden of an obligation" as that language is used in California Civil Code section 1457.

4. For all purposes of the Plan and the Chapter 11 Cases, Ryan shall have a single Allowed Class 4 General Unsecured Claim in the amount of $1,437,530.03 (the "Allowed Ryan Claim"). Ryan shall not amend or modify the Allowed Ryan Claim.

5. Except for the Allowed Ryan Claim and a Substantial Contribution Claim (subject to paragraph 8 below), Ryan shall not assert any Claims against the Debtors (including their current, former and future directors, officers and employees), the Reorganized Debtors (including their current, former and future directors, officers and employees), the Estates, the Administrative Agent, the Lenders, the members and professionals of the Committee, the Indenture Trustee, and the Holders of Unsecured Note Claims or any other persons specified in Section 10.8(c) of the Plan, and Ryan hereby agrees to be bound by the release, waiver and discharge set forth in section 10.8(c) of the Plan. Nothing contained herein shall waive or release the Allowed Ryan Claim against the Debtors or the Estates.

6. Each of the Debtors, the Reorganized Debtors and the Estates (each a

"Releasing Party") shall release and forever discharge Ryan from any and all claims, demands or causes of action of any kind, nature or description which any Releasing Party has had, now has or has made claim to have against Ryan for or by reason of any act, omission, matter, cause or thing whatsoever arising from the beginning of time to and including the date of this Stipulation, whether such claims, demands and causes of action are matured or unmatured or known or unknown. Each Releasing Party further represents, warrants and acknowledges that (i) it has been advised by counsel with respect to the releases contained in the Release Provision and (ii) is familiar with and voluntarily waives all of the rights and benefits which it has or may have in the future under any statute in any applicable jurisdiction which provides that a release may not apply to material unknown claims, including, without limitation, any right or benefit arising from Section 1542 of the Civil Code of the State of California, which provides as follows:

A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

Each Releasing Party hereby affirms its intent, upon the satisfaction of the conditions set forth in paragraph 1 above, to waive such unknown claims and to waive any statutory protection available in any applicable jurisdiction with respect thereto.

7. On account of the Allowed Ryan Claim, Ryan shall be entitled to receive his share of the distributions provided for Subclass 2 of Class 4 as set forth in the Plan (the "Ryan Distribution"), and any portion of the Allowed Ryan Claim that is greater than the Ryan Distribution shall remain unpaid by the Debtors, the Reorganized Debtors or the Estates. Other than the Ryan Distribution, Ryan acknowledges that any and all other rights to recoveries from the Debtors, the Reorganized Debtors or the Estates with respect to the Allowed Ryan Claim or any other prepetition claims (including the Prepetition Actions as they relate to the Debtors, the Reorganized Debtors or the Estates only) or postpetition claims (except for any Substantial Contribution Claim), including, without limitation, the right to elect to participate in Subclass 1 of Class 4 as set forth in the Plan, are discharged pursuant to the Plan.

8. Each of the Debtors, the Committee and the Administrative Agent hereby agrees that it shall not object to any motion or application by Ryan or its counsel, The McMillan Law Firm, APC and Spiegel Liao & Kagay, LLP (collectively, "Ryan Counsel"), for payment of a Substantial Contribution Claim of no more than $400,000 in the aggregate for any costs and expenses incurred by Ryan or Ryan Counsel during the Chapter 11 Cases; provided that, pursuant to Section 10.1 of the Plan, Ryan or Ryan Counsel must file any such motion or application for payment of a Substantial Contribution Claim on or before the date that is sixty (60) days after the Effective Date of the Plan.

9. Upon the Effective Date, Ryan's pending motion for relief from the automatic stay shall resolved, in that the automatic stay shall be terminated on a limited basis to allow Ryan to proceed with the prosecution of the Prepetition Actions for any claims or causes of action that Ryan may have against Verizon (the "Ryan Verizon Claims") subject to the defenses, if any, of Verizon; provided that the Ryan Verizon Claims shall not include, and Ryan shall not prosecute, any claims or causes of

action against Verizon, or any of its affiliates or current or former directors or officers, that belong to the Debtors, the Reorganized Debtors, the Estates and/or that are transferred to Litigation Trust. Nothing in this Stipulation (a) shall be construed as a release by Ryan of any of the Ryan Verizon Claims or (b) impair or restrict in any way Ryan's ability to prosecute the Ryan Verizon Claims, including, without limitation, engaging in any third party discovery or subpoenaing any third party witnesses. For the avoidance of doubt, the Prepetition Actions shall not be dismissed as to the Debtors following the effectiveness of this Stipulation until Ryan shall have had a reasonable opportunity to substitute Verizon into the Prepetition Actions, provided that the Debtors (including their current, former and future directors,

officers and employees), the Reorganized Debtors (including their current, former and future directors, officers and employees) and the Estates shall have no liability (monetary or otherwise) to Ryan, directly or indirectly, in connection with or as a result of the Prepetition Actions or the Ryan Verizon Claims.

10. Effectively immediately, all hearings on any of the Ryan Pleadings, as well as the deadline for filing a response relating to any such pleading, shall be continued until such time that the Court enters an order regarding this Stipulation.

11. The Bankruptcy Court shall retain jurisdiction to resolve any disputes or other matters relating to this Stipulation.

*[The remainder of this page intentionally left blank.]*

Dated: December 1, 2009

## EXHIBIT A

### *Sean Ryan Proofs of Claim*

#1717

B 10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT | PROOF OF CLAIM |
|---|---|

| Name of Debtor:<br>Idearc Inc., et al. | Case Number.<br>09-31828 (BJH) |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
|---|---|
| Name of Creditor (the person or other entity to whom the debtor owes money or property)·<br>Sean Ryan | ☐ Check this box to indicate that this claim amends a previously filed claim |
| Name and address where notices should be sent<br><br>Sean Ryan c/o The McMillan Law Firm, APC<br>4670 Nebo Drive, Suite 200, La Mesa, CA 91941-5230<br><br>Telephone number:<br>(619) 464-1500 | Court Claim Number:_____<br>*(If known)*<br><br>Filed on _____ |
| Name and address where payment should be sent (if different from above):<br><br><br>Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim · Attach copy of statement giving particulars<br><br>☐ Check this box if you are the debtor or trustee in this case. |

| | |
|---|---|
| **1. Amount of Claim as of Date Case Filed:** $ 1,437,530.03<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | **5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.<br><br>Specify the priority of the claim. |
| **2. Basis for Claim:** See attached<br>(See instruction #2 on reverse side.) | ☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B) |
| **3. Last four digits of any number by which creditor identifies debtor:** _____<br><br> **3a. Debtor may have scheduled account as:** _____<br> (See instruction #3a on reverse side.) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4). |
| **4. Secured Claim** (See instruction #4 on reverse side.)<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information<br><br>Nature of property or right of setoff: ☐ Real Estate ☐ Motor Vehicle ☐ Other<br>Describe:<br><br>Value of Property:$_____ Annual Interest Rate___%<br><br>Amount of arrearage and other charges as of time case filed included in secured claim,<br><br>if any: $_____ Basis for perfection: _____<br><br>Amount of Secured Claim: $_____ Amount Unsecured: $_____ | ☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5)<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7)<br><br>☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8) |
| **6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. | ☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__) |
| **7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (*See instruction 7 and definition of "redacted" on reverse side.*) | Amount entitled to priority:<br><br>$_____ |
| DO NOT SEND ORIGINAL DOCUMENTS<br>SCANNING.<br><br>If the documents are not available, please | 093182809081 0000000000252 |
| | *Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |

| | | FOR COURT USE ONLY |
|---|---|---|
| Date:<br>08/10/2009 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>@S.off A-McMillar<br>CBA 212502 | RECEIVED<br><br>AUG 10 2009<br><br>KURTZMAN CARSON CONSULTANTS |

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

☑ Date Stamped Copy Returned
☐ No self addressed stamped envelope
☐ No copy to return

2. Basis for claim. Sean Ryan is a former employee of Verizon Media Sales—West Inc., a wholly-owned subsidiary of Verizon Communications, Inc. (collectively, "Verizon"). Mr. Ryan sued in contract and tort for liabilities it owed him in connection with its termination of his employment. During the pendency of the action, Verizon assigned its liabilities to Idearc, and Idearc voluntarily assumed those liabilities by appearing in and defending Mr. Ryan's lawsuit against Verizon. Under

operation of California law, Idearc in accepting this assignment assumed the liability to satisfy Verizon's obligations, although Verizon also remains liable to Mr. Ryan unless and until these obligations are satisfied. Cal. Civ.Code § 1457; *Anderson v. De Urioste* (1892) 96 Cal. 404, 407–408, 31 P. 266; *Wiseman v. Sklar* (1930) 104 Cal.App. 369, 374, 285 P. 1081.

Following a jury trial, the California Superior Court awarded Mr. Ryan $55,511.92 in damages and penalties, $12,976.50 in costs, and $104,102.50 in attorneys' fees. Both Mr. Ryan and Idearc appealed the judgment of the California Superior Court, and the appeals were partially briefed when the bankruptcy of Idearc resulted in an automatic stay of proceedings.

In appealing the judgment of the California Superior Court, Mr. Ryan is asserting that he is legally entitled to have the Superior Court judgment altered to award him an additional $500,000 in damages and $ in attorneys' fees, over and above what has been awarded to him to date. Furthermore, before the automatic stay came into effect, Mr. Ryan expended an additional $121,576 in costs and attorneys' fees in pursuing his California state court appeal against Idearc and Verizon, to which he would be entitled by operation of California law for securing his claim under the California Labor Code, if his appeal is successful. Furthermore, Mr. Ryan has necessarily expended an additional $102,600 in attorneys' fees and costs in this court, to which he would for the same reason be entitled by operation of California law as necessary to securing his rights under the California Labor Code.

Consequently, Mr. Ryan has the following claims against Idearc:

| | |
|---|---|
| Compensatory damages and penalties awarded by California Superior Court | $ 55,511.92 |
| Attorneys' fees and costs awarded by California Superior Court | $117,079.03 |
| Compensatory damages sought in California Court of Appeal | $500,000 |
| Attorneys' fees and costs sought in California Court of Appeal | $643,363 |
| Attorneys' fees and costs expended in California appeals | $121,576 |

#1951

B 10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT | PROOF OF CLAIM |
|---|---|

| Name of Debtor. Idearc Inc., et al. | Case Number: 09-31828 (BJH) |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| Name of Creditor (the person or other entity to whom the debtor owes money or property): Sean Ryan | ☐ Check this box to indicate that this claim amends a previously filed claim. |
|---|---|
| Name and address where notices should be sent: Sean Ryan c/o The McMillan Law Firm, APC 4670 Nebo Drive, Suite 200, La Mesa, CA 91941-5230 | Court Claim Number: _____ (If known) |
| Telephone number: (619) 464-1500 | Filed on _____ |
| Name and address where payment should be sent (if different from above): Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars ☐ Check this box if you are the debtor or trustee in this case. |

**1. Amount of Claim as of Date Case Filed:** $ 1,437,530.03

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4

If all or part of your claim is entitled to priority, complete item 5

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges

**2. Basis for Claim:** See attached
(See instruction #2 on reverse side)

**3.** Last four digits of any number by which creditor identifies debtor: _____

3a. Debtor may have scheduled account as: _____
(See instruction #3a on reverse side)

**4. Secured Claim (See instruction #4 on reverse side)**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate ☐ Motor Vehicle ☐ Other
Describe:

Value of Property:$_____ Annual Interest Rate___%

Amount of arrearage and other charges as of time case filed included in secured claim,

if any: $_____ Basis for perfection: _____

Amount of Secured Claim: $_____ Amount Unsecured: $_____

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See instruction 7 and definition of "redacted" on reverse side.)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B)

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4)

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5)

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C §507 (a)(7)

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8)

☐ Other – Specify applicable paragraph of 11 U.S.C §507 (a)(__).

Amount entitled to priority:

$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment

| Date: 08/10/2009 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. | FOR COURT USE ONLY |
|---|---|---|

Scott H. McMillan
CDM 21250

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

0931828090810000000000260

2. Basis for claim. Sean Ryan is a former employee of Verizon Media Sales—West Inc., a wholly-owned subsidiary of Verizon Communications, Inc. (collectively, "Verizon"). Mr. Ryan sued in contract and tort for liabilities it owed him in connection with its termination of his employment. During the pendency of the action, Verizon assigned its liabilities to Idearc, and Idearc voluntarily assumed those lia-

bilities by appearing in and defending Mr. Ryan's lawsuit against Verizon. Under operation of California law, Idearc in accepting this assignment assumed the liability to satisfy Verizon's obligations, although Verizon also remains liable to Mr. Ryan unless and until these obligations are satisfied. Cal. Civ.Code § 1457; *Anderson v. De Urioste* (1892) 96 Cal. 404, 407–408, 31 P. 266; *Wiseman v. Sklar* (1930) 104 Cal.App. 369, 374, 285 P. 1081.

Following a jury trial, the California Superior Court awarded Mr. Ryan $55,511.92 in damages and penalties, $12,976.50 in costs, and $104,102.50 in attorneys' fees. Both Mr. Ryan and Idearc appealed the judgment of the California Superior Court, and the appeals were partially briefed when the bankruptcy of Idearc resulted in an automatic stay of proceedings.

In appealing the judgment of the California Superior Court, Mr. Ryan is asserting that he is legally entitled to have the Superior Court judgment altered to award him an additional $500,000 in damages and $ in attorneys' fees, over and above what has been awarded to him to date. Furthermore, before the automatic stay came into effect, Mr. Ryan expended an additional $121,576 in costs and attorneys' fees in pursuing his California state court appeal against Idearc and Verizon, to which he would be entitled by operation of California law for securing his claim under the California Labor Code, if his appeal is successful. Furthermore, Mr. Ryan has necessarily expended an additional $102,600 in attorneys' fees and costs in this court, to which he would for the same reason be entitled by operation of California law as necessary to securing his rights under the California Labor Code.

Consequently, Mr. Ryan has the following claims against Idearc:

| | |
|---|---|
| Compensatory damages and penalties awarded by California Superior Court | $ 55,511.92 |
| Attorneys' fees and costs awarded by California Superior Court | $117,079.03 |
| Compensatory damages sought in California Court of Appeal | $500,000 |
| Attorneys' fees and costs sought in California Court of Appeal | $643,363 |
| Attorneys' fees and costs expended in California appeals | $121,576 |

## EXHIBIT B

### Motions, Objections and Other Pleadings Filed by Sean Ryan

In re Idearc Inc. et al., Case No. 09–31828(BJH)

Sean Ryan v. Verizon Communications, Inc., et al., 09–03219(BJH)

| Docket No. | Title |
|---|---|
| 215 | Response of Party–In–Interest Sean Ryan to Debtor's Motion to Assume Employment Related Agreements |
| 216 | Response of Party–In–Interest Sean Ryan to Debtor's Motion to Assume Operating Agreements |
| 372 | Response of Party–In–Interest Sean Ryan to Debtor's Motion to Assume Agreements with Verizon Communications, Inc. |
| 373 | Judgment Creditors' Objections to the Declaration of Anthony Plec in Support of Debtors' Motion to Assume Certain Operating Agreements, Filed on May 20, 2009 in this Action |
| 374 | Judgment Creditors' Objections to the Declaration of Norman White in Support of Debtors' Motion to Assume Certain Operating Agreements, Filed on May 20, 2009 in this Action |
| 375 | Judgment Creditors' Objections to the Declaration of Carol Desmond–Donohue in Support of Debtors' Motion to Assume Certain Operating Agreements, Filed on May 20, 2009 in this Action |
| 376 | Judgment Creditors' Objections to the Declaration of Rosemary Foreman in Support of Motion to Assume Certain Operating Agreements, Filed on May 20, 2009 in this Action |
| 377 | Judgment Creditors' Objections to the Declaration of Ronald Lenington, Filed on May 20, 2009 in this Action |
| 378 | Judgment Creditors' Objections to the Declaration of Mike Wood in Support of Debtors' Mo- |

| Docket No. | Title |
|---|---|
| | tion to Assume Certain Operating Agreements, Filed on May 20, 2009 in this Action |
| 422 | Opposition of Sean Ryan to Motion of Official Committee of Unsecured Creditors, Pursuant to 11 U.S.C. §§ 105(A), 1102(B)(3) and 1103(C), for Nunc Pro Tunc Order Clarifying Requirements to (1) Provide Access to Information, and (2) Solicit and Receive Comments from Unsecured Creditors |
| 528 | Objection to Disclosure Statement |
| 578 | Sean Ryan and the McMillan Law Firm, APC's Motion to Reconsider and Modify Final Order Authorizing Use of Cash Collateral and Granting Adequate Protection to Lenders; Joinder In Motions of Official Creditor Committee [Doc 565] and Matlinpatterson Gobal Opportunities Partners (Cayman) III LP, Matlinpatterson Global Opportunities Partners III LP [Doc 543] |
| 584 | Sean Ryan and the McMillan Law Firm, APC's [Amended] Motion to Reconsider and Modify Final Order Authorizing Use of Cash Collateral and Granting Adequate Protection to Lenders; Joinder In Motions of Official Creditor Committee [Doc 565] and Matlinpatterson Global Opportunities Partners (Cayman) III LP, Matlinpatterson Global Opportunities Partners III LP [Doc 543] |
| 615 | Sean Ryan, Adversary Plaintiff vs. Verizon Communications, Inc., a Delaware Corporation, Scott W. Klein, Katherine J. Harless, Samuel D. Jones, Andrew Coticchio, Theresa Murray, John W. Diercksen, John J. Mueller, Donald B. Reed, Stephen L. Robertson, Thomas S. Rogers, Richard Carrion, Joseph Neubauer, Thomas O'Brien, Hugh Price, John Stafford, Robert Lane, Donald Nicolaisen, Clarence Otis, Martha Keeth, Dr. Sandra O. Moore, Ivan Seidenberg, Individuals, JPMorgan Chase Bank, N.A., in its Capacity for Itself and a Syndicate of Lenders that Extended Credit, Adversary Defendant |
| 819 | Objection to Debtors' Motion to Approve Stipulation [Docket 774] |
| 843 | Objection to Debtors' Witness and Exhibit List in Support of Debtors' Motion to Compromise [Docket 836] |
| 858 | Objection to Debtors' Motion Pursuant to 11 U.S.C. § 1121(D) for Entry of an Order Extending the Exclusive Period for Solicitation of Acceptances to their Plan of Reorganization [Docket 778] |
| 896 | Objection to Motion for Protective Order and to File Exhibits under Seal [Docket 880] |
| 989 | Objection to Milbank Tweed Application for Compensation and Reimbursement [Docket 881] |
| 1077 | Joinder in Objections of Matlin Patterson [Docket 1065] and Official Creditors Committee [Docket 1040] for Order Authorizing the Retention and Employment of Navigant Consulting, |

| Docket No. | Title |
|---|---|
| | Inc. as Litigation Consultant to the Debtors, Nunc Pro Tunc, To June 26, 2009 |
| 1198 | Joinder In Objection of Matlin Patterson [Docket 1166] to Debtors' Motion to Extend Time to Debtors' Second Motion Pursuant to Section 1121(D) for Entry of an Order Extending the Exclusive Period for Solicitation of Acceptances to their Plan of Reorganization Filed by Debtor Idearc Inc., Consolidated Debtor Idearc Information Services LLC, Idearc Media LLC, Idearc Media Sales—East Co., Idearc Media Sales—East LLC, Idearc Media Sales—West Inc., Idearc Media Services—East Inc., Idearc Media Services—West Inc., License Application Corporation, Second License Application Corporation [Docket 1083] |
| 1259 | Motion to Vacate Order Denying Sean Ryan's Amended Motion for Reconsideration of Cash Collateral Order [Docket 1200] [Expedited Hearing Requested] |
| 1262 | Notice of Issuance of Subpoena and Notice of Audio and Video Deposition of Designee of Verizon Communications, Inc., a Delaware Corporation |
| 1263 | Notice of Issuance of Subpoena and Notice of Audio and Video Deposition of Katherine J. Harless |
| 1264 | Notice of Issuance of Subpoena and Notice of Audio and Video Deposition of Dane Beck |
| 1284 | Motion to Disqualify Milbank, Tweed, Hadley & McCloy, LLP |
| 1286 | Sean Ryan's Objections to Debtors' Motion for Entry of an Order Approving Claims Estimation Procedures and Fixing Notice Procedures and Form and Manner of Notice [Docket 1085] |
| 1288 | Sean Ryan's Emergency Motion In Limine as to the Introduction of Evidence on Valuation for Purposes of Confirmation of Debtors' Plan of Reorganization |
| 1343 | Sean Ryan's Objection to Confirmation of the Debtors' First Amended Joint Plan of Reorganization |
| 1344 | Sean Ryan's Joinder In Objections to Confirmation |
| 1345 | Sean Ryan's Objection to the Debtors' Motion for Authority to Enter into a Standby Purchase Agreement [Docket 1224] |
| 1347 | Request for Setting of Hearing Re Emergency Motion In Limine [Docket No. 1288] |
| 1348 | Motion for Setting and Request for Expedited Hearing |